# United States Court of Appeals
## For the First Circuit

No. 13-2546

VLADIMIR PÉREZ,

Plaintiff, Appellant,

v.

HORIZON LINES, INC., and GRACE ACEVEDO,
in her personal and official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, Jr., U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Kayatta, Circuit Judges.

Godwin Aldarondo-Girald, with whom Aldarondo Girald Law
Office and Ericson Sanchez Preks were on brief, for appellant.
Carlos E. George-Iguina, with whom Alberto J. Bayouth-
Montes and O'Neill & Borges LLC were on brief, for appellees.

September 30, 2015

**HOWARD**, **Chief Judge**.    Appellee Horizon Lines, Inc. ("Horizon") terminated Appellant Vladimir Pérez for engaging in sexually inappropriate workplace conduct.    After he was terminated, Pérez then sued both Horizon and Grace Acevedo, the company's Puerto Rico Human Resources manager, claiming that his termination was unjust and that he had been the victim of sexual harassment by Acevedo.    The district court granted the defendants' motion for summary judgment, and we affirm.

## I.

We recount the facts and draw all reasonable inferences in the light most favorable to Pérez, the non-moving party. Statchen v. Palmer, 623 F.3d 15, 16 (1st Cir. 2010).    Horizon employed Pérez from 1998 to 2010.    At the time of his termination, he served as Horizon's Senior Yard Manager at the company's San Juan dock.    As part of his employment, Pérez agreed to abide by the company's Code of Business Conduct and Ethics.    That Code provided in pertinent part that: "Sexual harassment . . . includ[ing] unwelcome conduct of a physical, verbal, or visual nature that creates a hostile or offensive environment is unacceptable."    The Code further defines sexual harassment as including: "sexual innuendo, suggestive comments, insults, humor and jokes about sex, sexual propositions and threats . . . obscene gestures," or physical "touching such as pinching, brushing the body, and other similar behavior."

- 2 -

On October 15, 2010, Grace Acevedo, Horizon's Human Resources Manager in Puerto Rico, received an anonymous e-mail alleging that Pérez had indecently exposed himself, although the e-mail did not specify whether the incident took place on Horizon property. Attached to the e-mail was a photograph depicting a man from the waist down exposing his genitals (the "lower-torso photograph"). Either that same day or sometime thereafter (the record is unclear), Acevedo also received what was purported to be the top half of the same photograph (the "upper-torso photograph"). That image depicted a man's upper torso and face, identifiable as Appellant Pérez.

Acevedo notified Mark Blankenship, the company's North Carolina-based Vice President of Human Resources, about the photographs. Blankenship alerted Richard Rodriguez, the Puerto Rico Port Manager, that one of his employees may have taken the photograph while on Horizon property. Rodriguez compared the tile coloring and door stain depicted in the lower-torso photograph with various locations throughout the dock, and determined that the photograph must have been taken in the dock's Marine Building. Because the furniture in the photograph differed, however, Rodriguez concluded that it was at least a year old. On October 19, Rodriguez sent an e-mail to Blankenship reporting that the photograph was likely taken on company property. Shortly

thereafter, the two men discussed the matter while Rodriguez was in Charlotte on business.

Acevedo later conducted a formal investigation. On November 5, she met with Pérez and Jacob Wegrzyn (Horizon's General Manager in Puerto Rico) and confronted Pérez with the two photographs. Pérez admitted that the upper-torso photograph was of him, but denied that the lower-torso photograph depicted him. Horizon placed Pérez on paid administrative leave following the meeting.

Over the next ten days, Acevedo interviewed several of Pérez's co-workers about the photographs. One co-worker, Victor Ortega, admitted to taking both photographs and stated that they were of Pérez. Other Horizon employees either identified Pérez as the individual depicted in the lower-torso photograph or stated that they had heard about the photograph and had been told that it depicted Pérez. In addition, employees recounted a number of other occasions when Pérez had allegedly exposed his genitals to his co-workers in the workplace. Employees also described a general atmosphere of sexually-charged horseplay among Horizon's employees, in which Pérez participated.

Acevedo informed Blankenship about the results of her investigation. After consulting with the corporation's Compliance Committee, Blankenship decided to terminate Pérez's employment effective November 16. Blankenship informed Pérez by letter that,

"[b]ased on the evidence obtained," the company had determined that Pérez had "exhibited behavior on numerous occasions that is in strict violation [of] Horizon Lines' Code of Business Conduct Policy." Pérez sent Blankenship two follow-up e-mails requesting additional information and contesting the employment decision, but Blankenship twice reiterated his decision. In those communications, Pérez never alleged he had been subjected to sexual harassment.

A month later, on December 21, 2010, Pérez again challenged his termination in writing, this time through counsel. For the first time, Pérez also alleged that Acevedo had sexually harassed him. Specifically, he claimed that Acevedo had invited him to her home "with clear intentions of having sex" and had attempted to force Pérez to dance with her at company social events.

Pérez later filed a sexual harassment charge with the Equal Employment Opportunity Commission, and the EEOC issued him a right to sue letter. He then filed a complaint in federal court asserting sexual harassment and gender discrimination under Title VII and parallel claims under Puerto Rico law. Pérez also claimed unjust termination under Puerto Rico's Law 80. As developed before the district court, Pérez's sexual harassment claim broadened to focus primarily on four sets of events that allegedly took place between 2006 and 2010.

The first set of incidents involved two similar events at Horizon's annual Christmas parties in 2006 and 2007. Pérez testified during his deposition that, on both occasions, Acevedo urged him to dance with her and attempted "to drag him to the dance floor with force by taking him by the arm and pulling him." Pérez, made uncomfortable by Acevedo's requests, rejected them.

Second, Pérez claims that a sexual-innuendo-laced event took place at a bar in 2006 or 2007 following a Horizon company softball game. When Pérez was unable to locate his car keys, Acevedo admitted that she had placed them in her pants. She allegedly told Pérez that he would have to return to her home to retrieve them. Pérez balked at the request, and Acevedo did not return Pérez's keys for over an hour.

The third incident took place in December 2009 during an early morning meeting in Acevedo's office. Pérez claims that Acevedo called him to her office at 7:00 a.m. Although Pérez believed the meeting was work-related, Acevedo instead engaged in an elaborate "sea shell reading," which involved divining aspects of Pérez's life from the way in which the shells landed on a straw mat. Acevedo testified in her deposition that Pérez requested the reading, but Pérez denies that characterization. Pérez testified that during the reading Acevedo grabbed his hands and touched his arms in a sexually suggestive fashion.

The final incident involved Acevedo's almost weekly requests, throughout 2010, that Pérez bring cornbread and pastries to Acevedo's office. Pérez claims that Acevedo asked him to personally bring the cornbread and pastries to her office and to bring them "hot." He interpreted her request as an appeal for sexual favors, in part because Acevedo's office was in a different location than his own workplace and in part because of the prior sea shell reading in her office.

Following discovery, the district court granted the defendants' motion for summary judgment, rejecting Pérez's sexual harassment and gender discrimination claims and concluding that Horizon had cause to terminate him under Law 80. This timely appeal followed.

## II.

We review the district court's grant of summary judgment de novo, and will affirm if the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014). Because the parties dispute certain aspects of the factual record before us, we reiterate that "the mere existence of some alleged factual dispute" among the parties "will not defeat an otherwise properly supported motion for summary judgment" unless there is a "genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247-48 (1986) (emphasis in original).  As explained below, several of Pérez's contentions rely only on conclusory allegations and speculation to stay afloat; such allegations, without more, cannot create a genuine issue of material fact.  See Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010).

## A.    The Federal Claims

We begin with Pérez's federal claims brought under Title VII of the Civil Rights Act of 1964.  See 42 U.S.C. § 2000e et seq.  Pérez contends that Acevedo subjected him to consistent sexual harassment and asserts that Acevedo initiated the investigation that led to his termination not because of his alleged infractions, but because he had rebuffed her sexual advances.  He relies on both a hostile work environment theory and a quid pro quo theory of sexual harassment.  See generally O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001) (distinguishing between the theories).  We start, as the district court did, by considering the most recent event -- the cornbread and pastry requests -- understanding that the context and meaning of those requests are informed by the earlier incidents.[1]

---

[1] Pérez faults the district court for concluding that there were only four instances of alleged sexual harassment.  Yet, because he fails to identify or offer meaningful argumentation about any other instances that might contribute to his harassment claims, he has waived any reliance on them.  See United States v. Zannino, 895 F.3d 1, 17 (1st Cir. 1990).

To proceed on a quid pro quo theory of sexual harassment, Pérez must show that Acevedo used "her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliate[d] by taking action adversely affecting [Pérez's] employment." Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting O'Rourke, 235 F.3d at 728). Pérez claims that Acevedo warned him that she had Blankenship "eating out of her hand" and that "you do not know when you are going to need a favor." Pérez characterizes these statements as threats portending negative consequences if he failed to comply with Acevedo's advances.

Even accepting that Acevedo made such statements, the undisputed record here fails to support an inference that the cornbread requests were sexual demands directed at Pérez. Pérez's own interrogatory answers state that Acevedo requested that he send "union member employee 'Eleuterio Lopez'" to her office to fulfill her requests -- not that Pérez deliver the pastries himself. Pérez similarly testified during his deposition that López was "requested by [Acevedo] because she trusted him." No other evidence in the record contradicts this suggestion. See Libertad v. Welch, 53 F.3d 428, 435 (1st Cir. 1995) (noting that the non-moving party must adduce "sufficient evidence supporting the claimed factual dispute" that would require a factfinder to definitively resolve "the parties' differing versions of the truth

- 9 -

at trial").  López confirmed during his own deposition that he, and not Pérez, brought the pastries and cornbread to Acevedo on a weekly basis at Pérez's behest.  And, although Pérez now claims that Acevedo asked him to deliver the cornbread, Pérez plainly conceded at multiple points during his deposition that he never once delivered them and sent López instead.  Because the cornbread request was not even directed at Pérez, no reasonable jury could conclude that he has established that those requests constituted an implicit demand for sexual favors that he could have been punished for rebuffing.  To the extent that Pérez seeks to rely only on the much earlier incidents of alleged harassment standing on their own, we find those events far too remote to support his quid pro quo theory.[2]  Accordingly, that theory fails.

As to his hostile work environment theory of sexual harassment, Pérez must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his]

---

[2] Although we have not definitively resolved whether evidence of a close temporal proximity, alone, could support a quid pro quo claim in some circumstances, see Gerald v. Univ. of P.R., 707 F.3d 7, 23 n.9 (1st Cir. 2013), the other instances of alleged harassment Pérez relies on here took place between eleven months and four years prior to his termination.  Those events are too remote, without more, to support an inference that Acevedo retaliated against Pérez on their account.  Cf., e.g., Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (nine-month gap between age discrimination complaints and termination too remote to establish retaliation).

employment and create an abusive working environment." Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). There is no "mathematically precise test" for determining when harassment becomes sufficiently severe or pervasive or when a work environment "would reasonably be perceived, and is perceived, as hostile or abusive." Harris, 510 U.S. at 22; accord, e.g., Marrero v. Goya of P.R., Inc., 304 F.3d 7, 18-19 (1st Cir. 2002). Instead, we consider all of the "attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83 (1st Cir. 2006).

Even if a reasonable jury could conclude that Acevedo's requests that Pérez have another employee deliver cornbread and pastries to her office was harassing, no reasonable jury could conclude that those requests were sufficiently severe or objectively offensive to prove actionable. For one thing, on the scale of severe conduct, Acevedo's request falls considerably below even the mildest conduct that we have found actionable under Title VII. See, e.g., Ponte v. Steelcase Inc., 741 F.3d 310, 320-21 (1st Cir. 2014) (citing cases found sufficiently severe involving, for example, daily, humiliating "sexual remarks and

- 11 -

innuendos" and other inappropriate sexual contact including blowing in an employee's ear and standing over her "with their bodies squarely touching as she made copies"). Viewed most favorably to Pérez, Acevedo's requests could be considered subtle instances of sexual innuendo. But her requests involved no physical touching or threatening comments. Nor was any vulgar or sexual language involved. But see Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 57 (1st Cir. 2006) (noting that even vulgar comments "inappropriate to the workplace" or "completely unprofessional" may be insufficiently severe). While Acevedo's suggestion that Pérez instruct others to bring her cornbread and pastries may have made Pérez uncomfortable, "discomfort is not the test" for an actionable harassment claim. Ponte, 714 at 320. No reasonable jury could find Acevedo's requests severe.

Pérez also acknowledges that Horizon's employees often asked others to perform personal errands. This context is informative, and is ultimately problematic for Pérez. We assess "the objective severity of harassment . . . from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances" and giving "careful consideration" to "the social context in which particular behavior occurs and is experienced by its target." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (internal quotation marks omitted). Thus, even if Acevedo's requests for personal errands contravened

- 12 -

company policy, in the particular context of Horizon's San Juan dock an employee in Pérez's position is unlikely to have viewed Acevedo's request as something out of the ordinary. This is all the more true given Pérez's acknowledgement that Acevedo requested that he send another employee to purchase and deliver the pastries and that Pérez never once ran the errands himself. This fact considerably deflates Pérez's efforts to cast the requests as "objectively . . . offensive, such that a reasonable person would find it hostile or abusive." Ponte, 741 F.3d at 320. A Horizon employee may have objectively viewed Acevedo's requests as unprofessional, but unprofessional conduct is simply "not the focus of discrimination laws." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46-47 (1st Cir. 2003).

Nor has Pérez supplied any evidence from which a jury could infer that Acevedo's requests "unreasonably interfered with [his] work performance." Ponte, 741 F.3d at 320. Although he baldly asserts that Acevedo's requests intimidated him and led him to decide that he would never return to her office alone, he makes no effort to explain how the lack of in-person visits to Acevedo's office affected his work performance. Indeed, the only evidence he does supply demonstrates precisely the opposite. Rodriguez and others consistently provided Pérez with positive performance reviews throughout the time period during which he claims he endured harassment, indicating that Acevedo's conduct did not

- 13 -

negatively affect his ability to work as a Yard Manager.  See Pomales, 447 F.3d at 84.  Thus, whatever the impact of Acevedo's behavior on Pérez, no reasonable jury could find it sufficiently severe to have negatively affected his job performance.

Ultimately, the undisputed facts here show that the cornbread requests fall "beyond Title VII's purview" because, even as informed by the prior putative incidents of harassment, the requests did not contribute to the creation of "an objectively hostile or abusive work environment." Harris, 510 U.S. at 21. As the district court noted, the other incidents that Pérez alleges contributed to the hostile work environment were, on their own, time barred.  See Rivera-Diaz v. Humana Ins. of P.R., Inc., 748 F.3d 387, 390 (1st Cir. 2014) (noting that in a deferral jurisdiction such as Puerto Rico a plaintiff must file an EEOC charge within 300 days following the unlawful employment practice).  Pérez invokes the continuing violations doctrine and points to the cornbread incident as a discriminatory "anchoring act" falling within the limitations period that would allow him to recover for these otherwise time-barred acts.  Yet, an "anchoring act" must itself be discriminatory.  Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 747 (1st Cir. 2010).  It must be one that "contribut[ed] to that hostile environment." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002).  Because the cornbread requests are not actionable as a matter of law, Pérez's effort to

invoke the continuing violations doctrine necessarily fails.[3] See Lawton v. State Mut. Life Assur. Co. of Am., 101 F.3d 218, 222 (1st Cir. 1996) ("Common sense teaches that a plaintiff cannot resuscitate time-barred acts, said to be discriminatory, by the simple expedient of linking them to a non-identical, non-discriminatory, non-time barred act." (emphasis added)).

Finally, Pérez brings a claim of gender discrimination, which the district court properly rejected. Pérez characterizes Horizon's proffered reasons for his termination as a "sham" and claims that, in light of Acevedo's own alleged sexual advances toward him, Horizon has plainly treated Acevedo (a woman) differently than him (a man). But in the face of Horizon's "legitimate, nondiscriminatory reason" for terminating him, Pérez must do more than simply "elucidate specific facts which would enable a jury to find" Horizon's justification "a sham." Santangelo v. N.Y. Life Ins. Co., 785 F.3d 65, 70 (1st Cir. 2015)

---

[3] Pérez also contends that equitable tolling should apply because he would have had to direct any complaints to Acevedo. But Pérez acknowledged during his deposition that Horizon employees had access to an "ethics hotline" that bypassed Acevedo and went directly to individuals at Horizon's Charlotte headquarters. Without evidence to substantiate his fear that his complaints through the hotline would have proved unavailing, this record does not present the extraordinary circumstances necessary to apply the equitable tolling doctrine. See, e.g. Rivera-Diaz, 748 F.3d at 390; Abraham v. Woods Hole Oceanographic Inst., 553 F.3d 114, 119 (1st Cir. 2009) (noting that a plaintiff must show that "circumstances beyond his or her control precluded a timely filing").

(internal quotation marks omitted).  He must point to some evidence from which a jury could conclude that his termination was "a sham intended to cover up the employer's real motive."  Id.  Simply stated, he points us to no evidence, beyond rhetoric and empty assertions, to suggest that if there was any differential treatment, "gender was the reason for that difference."  Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir. 2002).

Accordingly, the district court properly granted summary judgment to the defendants on Pérez's federal claims.

**B.    The Commonwealth Claims**

Pérez also pursues several Puerto Rico claims.  Only his Law 80 claim merits extended discussion.[4]

---

[4] We can easily resolve Pérez's claims under Law 100 and Law 17 -- Puerto Rico's Title VII analogues prohibiting employment discrimination and sexual harassment, respectively.  See, e.g., Gerald v. Univ. of P.R., 707 F.3d 7, 28 (1st Cir. 2013); Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 26 n.10 (1st Cir. 2011).  The parties here agree that the commonwealth claims differ from their federal counterparts only with respect to the burden shifting framework that applies.  Cf. Dávila v. Corporacion de P.R. Para La Difusion Publica, 498 F.3d 9, 18 (1st Cir. 2007) (noting that "as applied to age discrimination," Law 100 "differs from the ADEA only with respect to how the burden-shifting framework operates").  That framework follows the Law 80 burden shifting framework, see Alvarez-Fonseca, 152 F.3d at 28, and as we explain below no reasonable jury could conclude that Horizon lacked cause to terminate Pérez.  Thus, to succeed on his Law 100 claim Pérez must show that Horizon's proffered reason was pretext specifically designed to mask gender discrimination. For the same reason that Pérez's Title VII gender discrimination claim fails, "it suffices to reiterate" that Pérez has "adduced no significantly probative evidence that his discharge was motivated by" his gender.  Dávila, 498 F.3d at 18.  As to the Law 17 claim, Pérez has neither provided developed argumentation about the burden shifting

- 16 -

Law 80 "modifies the concept of at-will employment" and provides monetary compensation to employees who are employed "without a fixed term" and who are discharged "without just cause." Otero-Burgos v. Inter Am. Univ., 558 F.3d 1, 7 (1st Cir. 2009); see P.R. Laws Ann. tit. 29, § 185a. The statute specifies several grounds that are considered good cause for termination including, as relevant here, when a "worker indulges in a pattern of improper or disorderly conduct" or when an employee has engaged in "repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee." P.R. Laws Ann. tit. 29, § 185b. The statute establishes that, by contrast, a "discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment shall not be considered . . . good cause." Id.

Law 80 applies a burden shifting framework that differs from the Title VII framework. Under Law 80, a plaintiff must both prove that he was discharged and allege that his dismissal was not justified. Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 28 (1st Cir. 1998). Law 80 then "shifts the burden of proof to the employer to show that the discharge was justified"

framework that should apply nor identified any cases explaining how a Law 17 claim would be resolved differently than his federal claims. For that reason, his Law 17 claim fails as well. See Zannino, 895 F.2d at 19.

- 17 -

by a "preponderance of the evidence."  Id. (citing P.R. Laws Ann. tit. 29, § 185k).  If the employer shoulders that burden, the employee must then rebut the showing of good cause.  Id.

We have not had occasion to precisely delineate the exact showing necessary for an employer to establish just cause under Law 80.  Nevertheless, we think it sufficiently clear that to show just cause an employer need only demonstrate that it had a reasonable basis to believe that an employee has engaged in one of those actions that the law identifies as establishing such cause. See P.R. Laws Ann. tit. 29, § 185b.

The text of Law 80 supports this reading.  By providing that an employer's decision to discharge an employee must not be "made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment," Law 80 focuses on the employer's reasoned deliberation.  Id.  The statement that an employer must not act on a "whim" appears to indicate that a "just" discharge is one where an employer provides a considered, non-arbitrary reason for an employee's termination that bears some relationship to the business' operation.

The Puerto Rico Supreme Court appears to have adopted this reading.  When considering Law 80 claims, that court consistently asks whether an employer's termination decision was "whimsical or abusive" or whether the employer has acted "abruptly or capriciously."  Narvaez v. Chase Manhattan Bank, 120 P.R. Dec.

- 18 -

731, 20 P.R. Offic. Trans. 766, 773 (1988); Báez García v. Cooper Labs., Inc., 120 P.R. Dec. 145, 20 P.R. Offic. Trans. 153, 162 (1987). Indeed, that court has otherwise resisted reading Law 80 to impose statutory penalties "just because an employer makes an error of judgment," since such a rigid reading (which would seem to require courts to regularly review the merits of companies' internal investigations) would go "beyond the letter and spirit of the law." Narvaez, 20 P.R. Offic. Trans. at 773.

Following as we must the Puerto Rico Supreme Court, we have also focused on the employer's reasonable belief rather than the objective veracity of the employer's action. In upholding the entry of summary judgment under Law 80, we have noted that a "perceived violation suffices to establish that [the employer] did not terminate [the employee] on a whim, but rather for a sensible business-related reason." Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 10 (1st Cir. 2007) (emphasis added). We have also found just cause, and affirmed the district court's grant of a Rule 50 motion in favor of an employer, where "although [the employee] denie[d] it," his employer had "overwhelming evidence that he instigated [a] fight with [his co-worker], and not the other way around." Alvarez-Fonseca, 152 F.3d at 28.

As we have said in a similar context, courts do not "sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business

- 19 -

decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991) (considering an Age Discrimination in Employment Act claim). In modifying at-will employment, Law 80 undoubtedly circumscribes the reasons for which an employer may terminate an employee. But, in doing so, we do not read the statute to require a factfinder to regularly review the objective accuracy of an employer's conclusions.[5] To establish just cause, therefore, Horizon merely had a burden to show that it had a reasonable basis to believe that Pérez had "indulge[d] in a pattern of improper or disorderly conduct" or engaged in "repeated violations of the reasonable rules and regulations established for the operation of the establishment." See P.R. Laws Ann. tit. 29, § 185b.

Although Pérez has shown that he was discharged, a reasonable jury could only conclude that Horizon has met its burden of showing just cause. Cf. Alvarez-Fonseca, 152 F.3d at 28 (affirming district court's post-trial grant of Rule 50 motion because the evidence presented at trial "would not permit a reasonable jury" to find that discharge was unjustified); Anderson, 477 U.S. at 250 (noting that the summary judgment standard "mirrors the standard for a directed verdict under [Rule]

---

[5] We have previously explained that an interpretation of Law 80 which would require that a jury always determine whether an employer had just cause to terminate an employee "does not conform with our understanding" of the statute. Hoyos, 488 F.3d at 6 n.4 (citing Velázquez-Fernández v. NCE Foods, Inc., 476 F,3d 6, 13 (1st Cir. 2007)).

- 20 -

50(a)"). Pérez admitted that he received a copy of and was aware of Horizon's Code of Business Conduct. Blakenship concluded that Pérez had violated that Code after reviewing the photos, determining in consultation with Rodriguez that those photos were taken on Horizon property, and considering the results of Acevedo's investigation. Acevedo's investigation not only suggested that the lower-torso photograph depicted Pérez, but also revealed that Pérez had exposed his genitals in the workplace on multiple occasions and that Pérez was generally involved in an atmosphere of inappropriate sexual horseplay and behavior.

Because Horizon established cause for Pérez's termination, to withstand summary judgment Pérez bore the burden to rebut that showing. Pérez expends considerable energy arguing that Horizon came to several incorrect conclusions over the course of its investigation. But to rebut Horizon's showing that it had a reasonable basis to believe that he had engaged in workplace misconduct, he must do more than show that Horizon may have gotten some of the particulars wrong. Cf. Dea v. Look, 810 F.2d 12, 15 (1st Cir. 1987) (finding "evidence casting doubt on the correctness of the employer's proffered reason for the discharge" insufficient to show pretext). Instead, Pérez had the burden to adduce probative evidence that Horizon did not genuinely believe in or did not in fact terminate Pérez for the reason given. His numerous claims that the evidence fails to show just cause are unavailing.

- 21 -

First, he denies that the lower-torso photograph depicted him. But that question is immaterial. Horizon was aware that Pérez denied the photograph was of him and, in any event, Pérez's termination letter definitively refutes his contention that the lower-torso photograph was the sole reason for his termination. In the letter, Blankenship stated that the investigation had revealed that Pérez had "exhibited behavior on numerous occasions that is in strict violation with Horizon Lines' Code of Business Conduct Policy." (Emphasis added). Blankenship was confronted with a plethora of evidence that Pérez had exposed his genitals in the workplace (although Pérez denies that he ever did) and, even now, Pérez concedes that he was involved in the sexually-charged horseplay among the San Juan dock employees. Horizon thus established that it had just cause to terminate Pérez for "indulg[ing] in a pattern of improper or disorderly conduct" or engaging in "repeated violations of the reasonable rules and regulations established for the operation of the establishment."[6] P.R. Laws Ann. tit. 29, § 185b.

---

[6] Pérez also relies on Horizon's concession that no one ever submitted a formal complaint about his behavior. We do not find this fact relevant. While Horizon's Code of Conduct requires employees to report harassing or inappropriate behavior, in the absence of a formal complaint a company may still conclude that certain behavior is "improper or disorderly."

Pérez also asserts that Acevedo singled him out, reinitiated the investigation on her own accord, and concealed relevant information from Blankenship. He seems to assume that if Acevedo's investigation was a sham then the decision Blankenship made in reliance on that investigation could not constitute adequate cause. Perhaps if the record contained some evidence tending to show that Blankenship was aware of false information contained in Acevedo's investigation notes or that Acevedo's information would give a reasonable supervisor reason to doubt the investigation's conclusions, such an argument could suffice to defeat summary judgment. But none of the contentions Pérez relies upon to buoy this argument are supported by the record.[7]

---

[7] We acknowledge the several minor discrepancies in Acevedo's investigation notes that Pérez claims demonstrate that the investigation was a sham. For example, Pérez points out that during the deposition another Horizon employee, Juan Carrero, Carrero denied meeting with Acevedo until after "Pérez was discharged" -- although Carrero's interview did take place after Pérez had been placed on administrative leave, and the record does not make clear what period Carrero meant when referring to Pérez's "discharge." Carrero also claimed that, contrary to Acevedo's interview notes, he had not discussed prior incidents when Pérez had exposed his genitalia. But Carrero did confirm that he had heard that the lower-torso photograph depicted Pérez, thus supporting Acevedo's overall conclusion. Pérez also repeatedly emphasizes the fact that Acevedo's son, a recently terminated Horizon employee, first sent the lower-torso photograph to her. Yet, when stripped of the "conclusory allegations, improbable inferences, acrimonious invective, [and] rank speculation," Ahern, 629 F.3d at 54, we fail to see how any of these facts provide probative evidence that something nefarious was going on or would allow a jury to infer that Blankenship's lacked cause to terminate Pérez, in light of repeated testimony from other employees corroborating the general thrust of Acevedo's findings.

First, the record does not support Pérez's speculation that Acevedo initiated her investigation entirely on her own accord after Rodriguez's own inquiry concluded and without direction from Blankenship. Although Rodriguez did testify that Blankenship had told him the initial inquiry into the lower-torso photograph's source would not move forward, Rodriguez, Blankenship, and Acevedo all testified that Rodriguez's inquiry was not a "formal" investigation but was, at most, an informal inquiry undertaken on Rodriguez's own initiative. Moreover, even Rodriguez testified that after his meeting with Blankenship, Acevedo indicated that she had received a second photograph, and Rodriguez surmised that the second photo was the reason "the investigation was going to continue." Indeed, Ortega's own deposition supports this same interpretation of events: he stated that he provided Acevedo with the upper-torso photograph depicting Pérez roughly two weeks after she received the lower-torso photograph (around the time that she started her investigation). And an e-mail from Acevedo to Blankenship sending two photographs on November 2, 2010 -- after Rodriguez met with Blankenship and around the time that Acevedo began to investigate the photographs in earnest -- substantiates that understanding of the record. Thus, beyond Pérez's own speculation, the record simply does not support his claim that Acevedo began an unauthorized investigation out of the blue.

Nor does the record support Pérez's two specific claims that Acevedo concealed evidence. First, the statement of another co-worker, Robert Batista, which Pérez says proves that Ortega had previously admitted that the lower-torso photo depicted Ortega (and not Pérez) was included in Acevedo's interview notes, which Blankenship reviewed before deciding to terminate Pérez. Moreover, Batista's statement is not necessarily the smoking gun that Pérez describes, and he fails to explain how it might have changed Blankenship's assessment.[8] Second, although Pérez asserts that Acevedo concealed that the lower-torso photograph was likely several years old, Rodriguez had already informed Blankenship via e-mail that the photograph was "very old." And, again, Pérez fails to explain how the age of the photograph would have had any impact on Blankenship's assessment that exposing oneself on Horizon's property, at any time, violated Horizon's Code of Business Conduct.[9]

---

[8] According to Acevedo's notes, Batista stated that Ortega had a photograph "of a big penis that he shows the girls he goes out with so they can see how big he has it." This statement may suggest only that Ortega showed women a photo that Ortega boasted depicted his own genitals, not that the photo was, in fact, of him. In fact, during his deposition, Batista further clarified that, to "be clear," he "didn't know" if that photo was the same as the lower-torso one that Acevedo received. Furthermore, another employee, Manuel Barreto, similarly stated during his deposition that he didn't "think that [Ortega] said it was a photograph of him," but that Ortega had only claimed that "[t]his is what there is for the gals."

[9] Pérez also vigorously asserts that others involved in the

- 25 -

Ultimately, "[n]othing in the record supports an inference" that Blankenship's reason for terminating Pérez's employment "was anything other than [Pérez's] own conduct." <u>Hoyos</u>, 488 F.3d at 10. Accordingly, because Pérez has failed to rebut Horizon's showing of just cause, the district court correctly granted summary judgment to the defendants on the Law 80 claim.

**III.**

Because the district court properly granted summary judgment on all of Pérez's claims, its judgment is **<u>affirmed</u>**.

---

horseplay were not similarly disciplined or terminated and thus summary judgment was improper. We are not persuaded by this argument. The record does not support that Pérez's co-workers similarly and repeatedly exposed themselves in the workplace. As such, Pérez's disparate treatment argument fails. Admittedly, this could be a different case if the record suggested that the company treated the co-workers differently <u>and</u> that the co-workers engaged in the same behavior as Pérez. However, this record does not support that conclusion.