17-287-cr
United States v. Jimenez

_____

August Term, 2017

(Argued: March 8, 2018                    Decided:  July 10, 2018)

Docket No. 17-287-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

JOSE JIMENEZ,

*Defendant-Appellant*.

_____

Before: POOLER, RAGGI, and DRONEY, *Circuit Judges*.

Jose Jimenez pled guilty to possession of ammunition after having been dishonorably discharged from the military, in violation of 18 U.S.C. § 922(g)(6). Having properly objected at the district court and reserved his right to appeal, he now challenges the validity of Section 922(g)(6) under the Second Amendment.

Assuming that he is entitled to Second Amendment protection, we find that Section 922(g)(6) as applied to Jimenez withstands intermediate scrutiny.

Affirmed.

_____

DANIEL HABIB, Federal Defenders of New York, Inc., New York, N.Y., *for Defendant-Appellant.*

SAMUEL RAYMOND, Assistant United States Attorney (Margaret Garnett, Assistant United States Attorney, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, N.Y., *for Appellee.*

POOLER, *Circuit Judge*:

Jose Jimenez pled guilty to possession of ammunition after having been dishonorably discharged from the military, in violation of 18 U.S.C. § 922(g)(6). Having properly objected at the district court and reserved his right to appeal, he now challenges the validity of Section 922(g)(6) under the Second Amendment. Assuming he is entitled to Second Amendment protection, we find that Section 922(g)(6) as applied to Jimenez withstands intermediate scrutiny. Accordingly, we AFFIRM the judgment of the district court.

2

# BACKGROUND

On June 3, 2015, Jose Jimenez was arrested in unlawful possession of a bullet retrieved from his person following an attempted undercover firearms purchase. Jimenez had agreed to drive Oscar Sanchez to the parking lot of a fast food restaurant in the Bronx on June 3, 2015 in exchange for $40. Sanchez had arranged to sell 20 handguns to a person who was, in fact, an undercover detective from the New York Police Department ("NYPD"). Jimenez claims that Sanchez did not inform him of the purpose of the trip.

After arriving at the parking lot, the detective and Sanchez got out of their cars, whereupon Sanchez showed the detective a 9-millimeter handgun and transferred a black bag into the trunk of the detective's car. At the detective's request, Sanchez opened the bag. Inside was a box of Capri Sun and a carjack but no guns. No deal having been done, Sanchez removed the bag from the detective's trunk, got back in the car with Jimenez and an unnamed woman, and they drove away.

But that was not the end of the matter. As part of a plan with the undercover NYPD purchaser, two agents from the Department of Alcohol, Tobacco, and Firearms ("ATF") had followed Jimenez's car. After the sale did not

3

occur, these agents ordered Jimenez to pull over several blocks from the parking lot. As the law enforcement officials approached the car, Sanchez removed a round from the chamber of his 9-millimeter handgun and handed it to Jimenez. The officials searched Jimenez's car, found Sanchez's weapon—which was loaded with 12 rounds of ammunition—and brought everybody to the ATF office in the Bronx for questioning. At the office, ATF agents patted down Jimenez and discovered the 9-millimeter round in his pocket.

Further investigation revealed that Jimenez had been dishonorably discharged from the Marines in 2012 after serving 18 months in a military prison for conspiracy to sell military property, wrongful disposition of military property, use and possession of a controlled substance, and conduct of a nature to bring discredit upon the armed forces, in violation of 10 U.S.C. §§ 881, 908, 912a, 934. He had been convicted of these offenses after confessing to using and dealing ecstasy and to possessing and selling firearms and night vision goggles that had been stolen from the military.

Federal law prohibits anybody who "has been discharged from the Armed Forces under dishonorable conditions" from possessing firearms or ammunition

4

"in or affecting commerce." 18 U.S.C. § 922(g)(6). On July 6, 2015 Jimenez was arrested, and on July 28 he was indicted, for violating this law.

In the district court, Jimenez filed a motion to dismiss the indictment challenging the constitutionality of Section 922(g)(6) under the Second Amendment. After the district court denied this motion, *United States v. Jimenez*, 15-cr-496, 2016 WL 8711451 (S.D.N.Y. June 3, 2016), he pled guilty pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, preserving his right to appeal the denial of his motion to dismiss. The district court sentenced him principally to three years' supervised release and entered judgment on January 11, 2017. Jimenez filed a notice of appeal the next day.

**DISCUSSION**

## I. The Nature of the Challenge

The sole question in front of us is whether Jimenez's prosecution and conviction for possessing ammunition after having been dishonorably discharged violates the Second Amendment. Jimenez presents his argument as a facial challenge to the statute under which he was convicted, but it is not.

"When a defendant has already been convicted for specific conduct under the challenged law," we will "examine the complainant's conduct before

5

analyzing other hypothetical applications" of that law. *United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012) (internal quotation marks omitted); *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 101 (2d Cir. 2012). If a defendant's conviction presents constitutional problems, those problems may be with the face of the statute or they may pertain only to the application of the statute to certain situations. But if the statute is constitutionally applied to the defendant, we follow the principal that "[f]ederal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (alterations and quotation marks omitted).

Contrary to Jimenez's urgings, a defendant to whom a statute constitutionally applies has no standing to challenge the statute's constitutionality as it applies to others differently situated. *See United States v. Farhane*, 634 F.3d 127, 138 (2d Cir. 2011). Because we find that Jimenez's Second Amendment rights were not violated, we will not hear his arguments about alleged constitutional problems with other potential applications of the statute under which he was convicted. He has "necessarily failed to state a facial challenge." *Decastro*, 682 F.3d at 163 (internal punctuation omitted).

## II. Evaluating Second Amendment Challenges

Since the Supreme Court announced that the Second Amendment protects an "individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), we have developed a two-step framework for determining whether legislation infringes on this right, *see New York State Rifle & Pistol Association, Inc. v. Cuomo*, 804 F.3d 242, 254-55 (2d Cir. 2015) ("*NYSRP v. Cuomo*"). First, "we must determine whether the challenged legislation impinges upon conduct protected by the Second Amendment." *Id.* at 254. Second, if we find that a law implicates the Second Amendment as *Heller* instructed us to interpret it, we determine the appropriate level of scrutiny to apply and evaluate the constitutionality of the law using that level of scrutiny. *See id.* at 257-58, 261. We review de novo a district court's determination that the application of a law does not violate the Second Amendment. *See New York State Rifle & Pistol Association, Inc. v. City of New York*, 883 F.3d 45, 54 (2d Cir. 2018) ("*NYSRP v. City*").

## III. Step One: Whether the Second Amendment Applies to Jimenez

There is some reason to think the Second Amendment does not apply to Jimenez. As far as we can tell, no other federal appellate court in the post-*Heller*

7

era has examined the ban we review today. *But see United States v. Day*, 476 F.2d 562, 568 (6th Cir. 1973) (before *Heller*, finding that 18 U.S.C. § 922(g)(6) complies with the Second Amendment). But precedent does provide some guidance. *Heller* instructed that its reading of the Second Amendment not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill" and other "presumptively lawful regulatory measures." 554 U.S. at 626, 627 n.26. We have previously relied on this passage to uphold the federal ban on ex-felons' access to firearms and ammunition. *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013); *see also United States v. Stuckey*, 317 F. App'x 48, 50 (2d Cir. 2009) (a previous non-precedential summary order coming to the same conclusion). *Heller* also emphasized that not all gun regulations implicate the right it announced. *See* 554 U.S. at 595, 626. The individual right that *Heller* found in the Second Amendment "protects only 'the sorts of weapons' that are (1) 'in common use' and (2) 'typically possessed by law-abiding citizens[1] for lawful

---

[1] Although the Court uses "citizens", presumably at least some non-citizens are covered by the Second Amendment. *Heller* quoted favorably *Verdugo-Urquidez*'s reading that "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with

purposes.'" *NYSRP v. Cuomo*, 804 F.3d at 254-55 (quoting *Heller*, 554 U.S. at 627, 625). Applying this limitation, we have held that "the Second Amendment does not protect the unlawful purpose of possessing a firearm in furtherance of a drug trafficking crime." *United States v. Bryant*, 711 F.3d 364, 370 (2d Cir. 2013) (emphasis omitted). Some of our sister circuits have found that individuals who have failed to abide by the law or are otherwise "unvirtuous," as that word was understood by the political elite of the Founding generation, are not entitled to *Heller*'s protections. *See United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) ("[T]he concept of a right to arms was inextricably and multifariously tied to that of the 'virtuous citizen,' such that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue…" (internal quotation marks omitted)); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) ("[F]elons are categorically different from the individuals who have a

---

this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It would seem, then, that at least members of the "national community" or those with a "sufficient connection" with that community are part of the "people" covered by the Second Amendment.

9

fundamental right to bear arms, and Vongxay's reliance on *Heller* is misplaced…"); *see also Binderup v. Attorney General United States of America*, 836 F.3d 336, 348-49 (3d Cir. 2016) (discussing the exclusion of "unvirtuous citizens" from Second Amendment protection); *Hamilton v. Pallozzi*, 848 F.3d 614, 625 (4th Cir. 2017) (same); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) ("While felons do not forfeit their constitutional rights upon being convicted, their status as felons substantially affects the level of protection those rights are accorded.").

However, we have never determined which particular conduct or characteristics can disqualify some individuals from the right that *Heller* recognized. Beginning to elaborate a test for who qualifies for the Second Amendment's protections risks introducing difficult questions into our jurisprudence, including questions that have divided other courts. *See*, *e.g.*, *Binderup*, *supra*; *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678 (6th Cir. 2016). Given the "vast *terra incognita*" that *Heller* left in its wake, *Kachalsky*, 701 F.3d at 89 (internal quotation marks omitted), we have routinely assumed that the Second Amendment applies to a given application of a firearms (or ammunition) regulation in order to determine whether the law being challenged would withstand the requisite level of scrutiny. If it would, we need not grapple

with whether the law actually implicates the Second Amendment, since it would comport with that Amendment's dictates in any case. *See NYSRP v. City*, 883 F.3d at 61-62; *NYSRP v. Cuomo*, 804 F.3d at 257; *Kwong v. Bloomberg*, 723 F.3d 160, 168 (2d Cir. 2013); *Kachalsky*, 701 F.3d at 89. Proceeding with our usual caution, we find that it is unnecessary to determine whether Jimenez can claim any Second Amendment protections because even if we assume (without deciding) that he can, we conclude that those protections do not preclude his conviction under Section 922(g)(6).

**IV.    Step Two: Scrutinizing Section 922(g)(6)**

**A. Determining the Appropriate Level of Scrutiny**

On the assumption that Jimenez maintained an individual right to bear arms under the Second Amendment, we must first determine the appropriate level of scrutiny to apply. In doing so, "we consider two factors: (1) how close the law comes to the core of the Second Amendment right and (2) the severity of the law's burden on the right." *NYSRP v. Cuomo*, 804 F.3d at 258 (internal quotation marks omitted). Laws that place substantial burdens on core rights are examined using strict scrutiny. *See NYSRP v. City*, 883 F.3d at 56. But laws that place either insubstantial burdens on conduct at the core of the Second Amendment or

substantial burdens on conduct outside the core of the Second Amendment (but nevertheless implicated by it) can be examined using intermediate scrutiny. *See id.*, 883 F.3d at 57-58 (applying intermediate scrutiny to non-substantial burden on core conduct); *id.* at 58-59 (applying intermediate scrutiny to substantial burden on non-core conduct); *NYSRP v. Cuomo*, 804 F.3d at 258-60 (substantial burden on non-core conduct); *Kwong*, 723 F.3d at 167-68 (non-substantial burden on core conduct); *Kachalsky*, 701 F.3d at 96 (substantial burden on non-core conduct).

It is clear from *Heller* and our decisions applying it that protecting oneself in one's home with a weapon in common use is at the core of the Second Amendment. *See Heller*, 554 U.S. at 634-35; *NYSRP v. City*, 883 F.3d at 56; *Kachalsky*, 701 F.3d at 93-94. Jimenez argues that this precedent establishes that a categorical ban on firearms or ammunition possession based on an individual's unfavorable military record necessarily places a substantial burden on core Second Amendment protections because it will always prevent those subject to the ban from any use of any weapon for any purpose, including self-defense within the home. This argument rests on a misunderstanding of the relevant precedent. *Heller* reads the Second Amendment as "elevat[ing] above all other

interests the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." 554 U.S. at 635 (emphasis added). The Supreme Court thus identified the core of Second Amendment protections by reference not only to particular uses and particular weapons but also to particular persons, namely, those who are "law-abiding and responsible." Since *Heller*, our court has consistently included the "law-abiding and responsible" qualification when identifying the Second Amendment's core protections. *See Decastro*, 682 F.3d at 166 (observing that heightened scrutiny is triggered only by restrictions that operate as a "substantial burden" on "ability of law-abiding citizens to possess and use a firearm for lawful purposes"); *NYSRP v. City*, 883 F.3d at 56 (quoting *Decastro*); *NYSRP v. Cuomo*, 804 F.3d at 259 (same). Other circuits have emphasized *Heller*'s specific concern for the rights of law-abiding and responsible individuals. *See United States v. Chester*, 628 F.3d 674, 682-83 (4th Cir. 2010) ("Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*—the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense…"); *Tyler*, 837 F.3d at 691 (Because "the risk inherent in firearms and other weapons distinguishes the Second Amendment

13

right from other fundamental rights…we should caution against imposing too high a burden on the government to justify its gun safety regulations, particularly where Congress has chosen to rely on prior judicial determinations that individuals pose a risk of danger to themselves or others." (internal citation and quotation marks omitted)); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) ("That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.").

Consistent with this precedent, we hold that those who, like Jimenez, have been found guilty of felony-equivalent conduct by a military tribunal are not among those "law-abiding and responsible" persons whose interests in possessing firearms are at the Amendment's core. The commission of a felony is a failure to abide by laws that our government has deemed especially important. *See Felony*, Black's Law Dictionary (10th ed. 2014) (defining felony as a "serious crime"). The Supreme Court recognized this fact in specifically identifying felon bans as "presumptively lawful." *Heller*, 554 U.S. at 627. There is no reason to depart from that presumption here, given that Jimenez was court martialed for, among other things, trafficking in stolen firearms, conduct for which civilians can be convicted of a felony pursuant to 18 U.S.C. § 922(a)(1).

14

Though Jimenez objects to the lesser procedural protections of military tribunals, it is well established that "the requirements of the Constitution are not violated where…a court-martial is convened to try a serviceman who was a member of the Armed Services at the time of the offense charged." *Solorio v. United States*, 483 U.S. 435, 450-51 (1987). "It is alike indisputable that if a court-martial has jurisdiction to try an officer or soldier for a crime, its judgment will be accorded the finality and conclusiveness as to the issues involved which attend the judgments of a civil court in a case of which it may legally take cognizance." *Grafton v. United States*, 206 U.S. 333, 345 (1907); *see also United States v. Dixon*, 509 U.S. 688, 726 (1993) ("*Grafton*, and the principle it embodies, are controlling."); *see also Ortiz v. United States*, 585 U.S. ___ (2018) (slip op. at 2, 6) (discussing how the "court-martial system" resembles "civilian structures of justice" such that "the judicial character and constitutional pedigree" thereof "enable [the Supreme] Court…to review the decisions of the court sitting at its apex") Thus, those convicted of felony-equivalent conduct by a military tribunal have been duly removed from the category of "law-abiding" as that term is used in *Heller*.

15

Though Jimenez's interest is outside the core protections of the Second Amendment, it is burdened substantially. Section 922(g)(6) makes it "unlawful for any person…who has been discharged from the Armed Forces under dishonorable conditions…to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(6). Jimenez was dishonorably discharged. This law thus prohibits Jimenez from possessing firearms or ammunition of any kind for any purpose. It leaves him *no* alternative means of doing so, let alone *adequate* alternatives. *See NYSRP v. City*, 883 F.3d at 56, 60 (discussing the role of "adequate alternatives" in determining the burden).

We have usually analyzed substantial burdens on non-core rights with intermediate scrutiny. *See NYSRP v. Cuomo*, 804 F.3d at 258-60; *Kachalsky*, 701 F.3d at 96.

**B. Applying Intermediate Scrutiny**

To withstand intermediate scrutiny, a law must generally be "substantially related to the achievement of an important governmental interest." *NYSRP v. City*, 883 F.3d at 62. Jimenez "concedes the importance of the government's

16

interest," Appellant's Br. at 51, as he must, since we have repeatedly held that "[t]he regulation of firearms is a paramount issue of public safety," *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013), which is always a "compelling" governmental interest. *NYSRP v. City*, 883 F.3d at 62; *NYSRP v. Cuomo*, 804 F.3d at 261; *Kwong*, 723 F.3d at 169; *Kachalsky*, 701. F.3d at 97; *see also, e.g., United States v. Reese*, 627 F.3d 792, 804 n.4 (10th Cir. 2010); *Tyler*, 837 F.3d at 693. Because "state regulation of the right to bear arms has always been more robust than analogous regulation of other constitutional rights," we have found a substantial relation between the means chosen and the compelling end of safety "[s]o long as the [government] produce[s] evidence that fairly supports [its] rationale." *NYSRP v. Cuomo*, 804 F.3d at 261 (alterations and citations omitted).

Jimenez argues that, as to Section 922(g)(6), "the mismatch between means and end is comical." Appellant's Br. at 51. Specifically, he points to the fact that the government presents "no studies, no empirical data, no expert testimony, no legislative findings…to substantiate the belief that no dishonorably discharged veteran may be trusted with a bullet." *Id.* He is correct that the government does not present any statistical evidence about the propensity for violence among the dishonorably discharged. Instead, the government relies on the fact that those

17

convicted of felonies have been widely found to be more dangerous with deadly weapons. Since Jimenez was discharged for felony-equivalent conduct, the government argues, the reasoning that applies in those cases applies here.[2]

We agree with the government. Section 922(g)(6) became law as part of the Gun Control Act of 1968, which creates similar bans for other "special risk groups": felons, fugitives, illegal drug users and addicts, the mentally incompetent, those who have "been committed to a mental institution," undocumented immigrants, individuals with nonimmigrant visas, those who have renounced United States citizenship, those subject to a domestic violence order of protection, and those convicted of a misdemeanor crime of domestic violence. 18 U.S.C. § 922(g)(1)-(9); Franklin E. Zimring, *Firearms and Federal Law: The Gun Control Act of 1968*, 4 J. Legal Stud. 133, 152 (1975) (using the term "special risk groups" to describe this list). When the military discharge provision of the Gun Control Act was introduced, it was treated as of a piece with all of

---

[2] Much of the briefs argue over the wisdom of preventing those dishonorably discharged for non-felony-equivalent conduct from possessing firearms. We do not reach these arguments or the questions they present. Since we find that the statute is constitutionally applied to those, like Jimenez, who have been dishonorably discharged for felony-equivalent conduct, Jimenez does not have standing to raise questions about other applications of the statute.

these special risk groups and specifically with the felon ban. *See* 114 Cong. Rec. 13,868-69 (1968) (statement of Sen. Long). That portion of the Gun Control Act was meant to deprive those who had demonstrated an inability or unwillingness to take others' safety into account, or otherwise might be especially dangerous with a gun, from possessing deadly weapons.

There is no reason to think that Jimenez is more likely to handle a gun responsibly just because his conviction for dealing drugs and stolen military equipment (including firearms) occurred in a military tribunal rather than in state or federal court. Dishonorable discharges are generally reserved for members of the military who have "been convicted [by court-martial] of offenses usually recognized in civilian jurisdictions as felonies, or of offenses of a military nature requiring severe punishment."[3] Manual for Courts-Martial United States

---

[3] There are two other forms of "punitive separation": a "dismissal," which is reserved for commissioned officers, and a "bad-conduct discharge," which is generally for less serious offenses. Manual for Courts-Martial United States (2016 ed.) Rule 1003(b)(8)(A), (C); *see also* 53A Am. Jur. 2d Military and Civil Defense § 164. The legislative history of Section 922(g)(6) suggests that all of these discharges as well as any other discharge "on conditions less than honorable" were meant to be included. 114 Cong. Rec. 13,868 (1968) (statement of Sen. Long). Because Jimenez was dishonorably discharged, we focus on that form of separation. We leave it up to future courts to determine which others fall within

(2016 ed.) Rule 1003(b)(8)(B).[4] Those who, while in the military, receive extensive training on how to use deadly weapons are likely to be more dangerous with firearms should they be thoughtless or heartless enough to turn them onto civilians. Section 922(g)(6) was added to the Gun Control Act at least in part based on the example of Lee Harvey Oswald, who used his Marine marksmanship training to assassinate President John F. Kennedy. *See* 114 Cong. Rec. 13,868-69 (1968) (statement of Sen. Long) (discussing Oswald's discharge and noting that he would be prohibited from owning a gun under the Act); Report of the President's Commission on the Assassination of President Kennedy, 191-92 (1964) (discussing Oswald's marksmanship training).

That military tribunals have fewer procedural protections than civilian courts does not by itself make Congress's reliance on those tribunals for a determination of who should and should not be dishonorably discharged unreasonable. As discussed above, those tribunals have been found to operate

---

the meaning of "discharged from the Armed Forces under dishonorable conditions." 18 U.S.C. § 922(g)(6).

[4] This manual has guided courts-martial since enacted by executive order in 1984. *See* Exec. Order 12473, 49 Fed. Reg. 17152 (Apr. 13, 1984). It is amended every year. *See*, *e.g.*, Exec. Order No. 13825, 83 FR 9889 (Mar. 1, 2018). The provisions on punitive separation seem to have remained unchanged since 1984.

consistently with the Constitution and their judgments bar subsequent civilian prosecution for charges resolved therein. Moreover, the Supreme Court has previously approved of Congress's reliance on convictions by courts-martial in determining which members of the military are subject to civil disabilities such as mandatory sex-offender registration. *See United States v. Kebodeaux*, 570 U.S. 387 (2013). As we have said before, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers of carrying firearms and the manner to combat those risks." *Kachalsky*, 701 F.3d at 97 (internal quotation marks omitted). It was reasonable for Congress to rely upon the military's determination that one of its members is no longer responsible enough to bear arms on the battlefield as a basis for preventing that person from bearing arms in civilian life.

Finally, Jimenez contends that his conviction for possession of ammunition rather than firearms changes the analysis. He argues that "[a] bullet is categorically less dangerous than a gun" since "even an unloaded gun can be used to menace, threaten, or strike a victim." Appellant's Br. at 45-46. We are not convinced. Congress is just as justified in banning certain people from possessing

ammunition as it is in banning them from possessing guns. Guns are not regulated because they can be used as blunt objects: tire irons and baseball bats remain legal. Guns are regulated because of their capacity to launch bullets at speeds sufficient to cleave flesh and shatter bone. Without bullets, guns do not have that capacity. Congress has the same interest in regulating bullet possession as firearm possession.

## CONCLUSION

Jimenez's conviction for possessing a bullet after being dishonorably discharged for felony-equivalent conduct does not violate the Second Amendment. The judgment of the district court is AFFIRMED.

22