15-638-cv
New York State Rifle & Pistol Ass'n, Inc. v. City of New York

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

————————

August Term, 2016

(Argued: August 17, 2016    Decided: February 23, 2018)

Docket No. 15-638-cv

————————

THE NEW YORK STATE RIFLE & PISTOL ASSOCIATION, INC., ROMOLO COLANTONE, EFRAIN ALVAREZ, and JOSE ANTHONY IRIZARRY,[*]

*Plaintiffs-Appellants*,

— v. —

THE CITY OF NEW YORK and THE NEW YORK CITY POLICE DEPARTMENT–LICENSE DIVISION,

*Defendants-Appellees.*

————————

B e f o r e:

POOLER, LYNCH, and CARNEY, *Circuit Judges*

————————

—————

[*] The Clerk of Court is respectfully directed to amend the caption of the case to the conform to the caption above.

Plaintiffs New York State Rifle & Pistol Association, Inc., Romolo Colantone, Efrain Alvarez, and Jose Anthony Irizarry brought suit against Defendants City of New York and New York Police Department–License Division, challenging a provision of a New York City licensing scheme under which an individual with a "premises license" for a handgun may remove the handgun from the designated premises only for specified purposes, including going to a shooting range in New York City. Plaintiffs sought to remove licensed handguns from their licensed premises for other purposes, including going to shooting ranges outside New York City and transporting the handgun to a second home in upstate New York. The United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) denied plaintiffs' motions for summary judgment and for a preliminary injunction, and granted defendants' cross-motion for summary judgment. The district court held that the restrictions in premises licenses do not violate the Second Amendment, the Commerce Clause, the fundamental right to travel, or the First Amendment. Plaintiffs appeal that judgment.

We AFFIRM.

---

ERIN MURPHY, Bancroft PLLC (Paul D. Clement, D. Zachary Hudson, Andrew N. Ferguson, Bancroft PLLC; Brian T. Stapleton, Matthew S. Lerner, Goldberg Segalla LLP, *on the brief*), Washington, D.C., *for Plaintiffs-Appellants New York State Rifle & Pistol Association, Inc., Romolo Colantone, Efrain Alvarez, and Jose Anthony Irizarry.*

SUSAN PAULSON, Assistant Corporation Counsel (Richard Dearing, Assistant Corporation Counsel, *on the brief*), for Zachary W. Carter, Corporation Counsel of the City of New York, New York, N.Y., *for Defendants-Appellees City of New York and the New York City Police Department–License Division.*

Charles J. Cooper, David H. Thompson, Peter A. Patterson, Cooper & Kirk, PLLC, Washington, D.C., *for Amicus Curiae* National Rifle Association of America, Inc., *in support of Plaintiffs-Appellants.*

2

Dan M. Peterson, Fairfax, VA; Stephen P. Halbrook, Fairfax, VA, *for Amici Curiae* Western States Sheriffs' Association, Law Enforcement Legal Defense Fund, Law Enforcement Action Network, CRPA Foundation, Law Enforcement Alliance of America, and International Law Enforcement Educators and Trainers Association, *in support of Plaintiffs-Appellants*.

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs New York State Rifle & Pistol Association, Romolo Colantone, Efrain Alvarez, and Jose Anthony Irizarry (collectively, "the Plaintiffs") brought suit against Defendants City of New York and the New York Police Department–License Division (collectively, "the City"), challenging a provision of a New York City licensing scheme, Title 38, Chapter Five, Section 23 of the Rules of the City of New York ("RCNY"), under which an individual with a "premises license" for a handgun may not remove the handgun "from the address specified on the license except as otherwise provided in this chapter." 38 RCNY § 5-23(a)(1). Under Rule 5-23 ("the Rule"), the licensee "may transport her/his handgun(s) directly to and from an authorized small arms range/shooting club, unloaded, in a locked container, the ammunition to be carried separately." *Id*. § 5-23(a)(3).

The New York Police Department–License Division ("License Division") has defined "authorized" facilities, among other requirements, to be "those located in New York City." App. 38. The Plaintiffs sought to remove handguns from the licensed premises for the purposes of going to shooting ranges and engaging in target practice outside New York City as well as, in the case of one Plaintiff, transporting the handgun to a second home in upstate New York. The United States District Court for the Southern District of New York (Robert W. Sweet, *J.*) denied the Plaintiffs' motions for summary judgment and for a preliminary injunction, and granted the City's cross-motion for summary judgment. The district court held that the restrictions in premises licenses do not violate the Second Amendment, the Commerce Clause, the fundamental right to travel, or the First Amendment. *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 268 (S.D.N.Y. 2015). The Plaintiffs appeal that judgment.

For the reasons that follow, we AFFIRM.

## BACKGROUND

New York State law prohibits possession of "firearms" absent a license. N.Y. Penal Law §§ 265.01–265.04, 265.20(a)(3).[1] Section 400.00 of the Penal Law establishes the "exclusive statutory mechanism for the licensing of firearms in New York State." *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994); *see also Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 85 (2d Cir. 2012). Licenses can be held by individuals at least twenty-one years of age, of good moral character, and "concerning whom no good cause exists for the denial of the license," among other requirements. N.Y. Penal Law § 400.00(1)(a)–(b), (n).

To obtain a handgun license, an individual must apply to his or her local licensing officer. "The application process for a license is rigorous and administered locally. Every application triggers a local investigation by police into the applicant's mental health history, criminal history, [and] moral character." *Kachalsky*, 701 F.3d at 87 (internal citation and quotation marks

---

[1] As we explained in *Kachalsky v. County of Westchester*, the term "firearm" in New York law has a restricted meaning and does not encompass all guns to which the term generally applies in ordinary usage. 701 F.3d 81, 85 (2d Cir. 2012). Essentially, a "firearm" is defined by the relevant statutes to include pistols and revolvers, assault weapons, and rifles and shotguns with barrels of specified shortened lengths. *Id.*, citing N.Y. Penal Law § 265.00(3). Ordinary rifles and shotguns are not subject to the licensing provisions of the statute.

omitted). The licensing officers "are vested with considerable discretion in deciding whether to grant a license application, particularly in determining whether proper cause exists for the issuance of a carry license." *Id.* (internal quotation marks omitted). The New York Penal Law specifies that in New York City, the licensing officer is the City's Police Commissioner. N.Y. Penal Law § 265.00(10). The License Division exercises the Commissioner's authority to review applications for licenses, and issues handgun licenses. *See* 38 RCNY §§ 5-01 – 5-11.

The Penal Law establishes two primary types of handgun licenses: "carry" licenses and "premises" licenses. N.Y. Penal Law §§ 400.00(2)(a), (f). A carry license allows an individual to "have and carry [a] concealed" handgun "without regard to employment or place of possession . . . when proper cause exists" for the license to be issued. *Id.* § 400.00(2)(f).

> "Proper cause" is not defined by the Penal Law, but New York State courts have defined the term to include carrying a handgun for target practice, hunting, or self-defense. When an applicant demonstrates proper cause to carry a handgun for target practice or hunting, the licensing officer may restrict a carry license "to the purposes that justified the issuance."

*Kachalsky*, 701 F.3d at 86, quoting *O'Connor*, 83 N.Y.2d at 921. Generally, a carry

6

license is valid throughout the state except that it is not valid within New York City "unless a special permit granting validity is issued by the police commissioner" of New York City.[3] N.Y. Penal Law § 400.00(6).

A premises license is specific to the premises for which it is issued. The type of license at issue in this case allows a licensee to "have and possess in his dwelling" a pistol or revolver. *Id.* § 400.00(2)(a). Under the RCNY, a "premises license – residence" issued to a New York City resident is specific to a particular address, and "[t]he handguns listed on th[e] license may not be removed from the address specified on the license except" in limited circumstances, including the following:

---

[3]Another handgun license available to New York City residents is a "carry business license," which "permits the carrying of a handgun concealed on the person." 38 RCNY § 5-23(b). Andrew Lunetta, the former Commanding Officer of the License Division, has averred that to obtain such a license, "the applicant must show that he/she has a need to carry a concealed firearm which is distinguishable from that of the general public, for example, the applicant carries large sums of cash or valuables on a regular basis or is exposed to extraordinary personal danger in daily life." App. 75. The Plaintiffs have not alleged that they applied for carry business licenses nor that they were denied such licenses. Nor have the Plaintiffs claimed to hold premises licenses for their businesses, a category of license which would also be authorized under the Rule. 38 RCNY § 5-23(a). Accordingly, we need not further discuss carry business licenses or business premises licenses.

(3) To maintain proficiency in the use of the handgun, the licensee may transport her/his handgun(s) directly to and from an authorized small arms range/shooting club, unloaded, and in a locked container, the ammunition to be carried separately.

(4) A licensee may transport her/his handgun(s) directly to and from an authorized area designated by the New York State Fish and Wildlife Law and in compliance with all pertinent hunting regulations, unloaded, in a locked container, the ammunition to be carried separately, after the licensee has requested and received a "Police Department – City of New York Hunting Authorization" Amendment attached to her/his license.

38 RCNY § 5-23(a).

Under Rule 5-23(a)(3), an "authorized small arms range/shooting club" is one that, among other requirements, is located in New York City, as the License Division notified Plaintiff Colantone in a letter dated May 15, 2012. App. 28. When this challenge was brought, there were seven such facilities in New York City, including at least one in each of the City's five boroughs.[4] The New York Police Department ("NYPD") also previously issued "target licenses" that allowed the licensee to take his or her handgun to shooting ranges and competitions outside New York City. These target licenses were not mandated by

---

[4] Neither of the parties has brought to our attention any change in that number.

8

state law, but were issued by the NYPD in its discretion as the licensing agency for New York City. The NYPD received reports that licensees were using target licenses to carry weapons to many other locations, and not in the requisite unloaded and enclosed condition. In part because of these issues, the NYPD eliminated the target license in 2001.

Plaintiffs Colantone, Irizarry, and Alvarez hold premises licenses issued by the License Division that allow them to possess handguns in their residences in New York City. They seek to transport their handguns outside the premises for purposes other than the ones authorized by Rule 5-23. All three Plaintiffs seek to transport their handguns to shooting ranges and competitions outside New York City.[5] In addition, Colantone, who owns a second home in Hancock, New York, seeks to transport his handgun between the premises for which it is licensed in New York City and his Hancock house. These plaintiffs, along with the New York State Rifle & Pistol Association, filed suit in the Southern District of New

---

[5] The Plaintiffs seek to take their handguns to tournaments such as the NRA Sectional Championships held in Roslyn, New York, and Old Bridge, New Jersey, and the Steel Challenge Championships, held in Old Bridge, New Jersey. They also argue that it would be more convenient for some of them to engage in target practice at shooting ranges located near, but outside of, New York City, rather than at ranges located within the City but farther from their homes.

York, seeking a declaration that the restrictions imposed by the Rule were unconstitutional and an injunction against its enforcement.

The Plaintiffs moved for summary judgment and for a preliminary injunction, and the City cross moved for summary judgment. The district court granted the City's cross-motion for summary judgment and dismissed the complaint. The district court determined that the Rule "merely regulates rather than restricts the right to possess a firearm in the home and is a minimal, or at most, modest burden on the right." *N.Y. Rifle & Pistol Ass'n.*, 86 F. Supp. 3d at 260 (brackets and internal quotation marks omitted). Accordingly, the district court held that the Rule did not violate the Plaintiffs' Second Amendment rights. *Id.* at 160–61. The district court also found that the Rule did not violate the dormant Commerce Clause, the First Amendment right of expressive association, or the fundamental right to travel. *Id.* at 263–66.

## DISCUSSION

The Plaintiffs argue on appeal, as they did below, that by restricting their ability to transport firearms outside the City, Rule 5-23 violates the Second Amendment, the dormant Commerce Clause, the First Amendment right of expressive association, and the fundamental right to travel. We review a district

court's decision on summary judgment *de novo*, construing the evidence in the light most favorable to the non-moving party. *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 252 (2d Cir. 2015). "We also review *de novo* the district court's legal conclusions, including those interpreting and determining the constitutionality of a statute." *Id.* (internal quotation marks omitted). Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For the reasons explained below, we reject each of the Plaintiffs' arguments.

## I.  Rule 5-23 Does Not Violate the Second Amendment.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court announced that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). In *McDonald v. City of Chicago*, the Court held that this right is incorporated within the Due Process Clause of the Fourteenth Amendment, and therefore binds the States as well as the Federal Government. 561 U.S. 742,

11

791 (2010). However, the Court remarked that its holding should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. "Neither *Heller* nor *McDonald* . . . delineated the precise scope of the Second Amendment or the standards by which lower courts should assess the constitutionality of firearms restrictions." *N.Y. State Rifle*, 804 F.3d at 254.

### A. Analytical Framework

Following *Heller*, this Circuit adopted a "two-step inquiry" for "determining the constitutionality of firearm restrictions." *Id.* First, we "determine whether the challenged legislation impinges upon conduct protected by the Second Amendment," and second, if we "conclude[] that the statute[] impinge[s] upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny." *Id.* at 254, 257.

### 1. First Step: Whether the Second Amendment Applies

At the first step, the Plaintiffs argue that Rule 5-23 impinges on conduct protected by the Second Amendment. We need not decide whether that is so,

because, as explained below, the Rule "pass[es] constitutional muster" under intermediate scrutiny. *Id.* at 257. Thus, as in *New York State Rifle*, we "proceed on the assumption that [the Rule restricts activity] protected by the Second Amendment." *Id.*

### 2. Second Step: Level of Scrutiny

At the second step, we consider whether to apply heightened scrutiny. In Second Amendment cases, our Circuit has recognized at least two forms of heightened scrutiny — strict and intermediate. *See Kachalsky*, 701 F.3d at 93 (holding that although "some form of heightened scrutiny would be appropriate," strict scrutiny was not necessary, and instead applying intermediate scrutiny). Our Circuit has also recognized that a form of non-heightened scrutiny may be applied in some Second Amendment cases. *See United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (holding that heightened scrutiny is not appropriate where the regulation does not impose a "substantial burden on the ability of [plaintiffs] to possess and use a firearm for self-defense"). This recognition is limited by the Supreme Court's indication in *Heller* that rational basis review may be inappropriate for certain regulations involving Second Amendment rights. 554 U.S. at 628 n.27. But we need not determine here

which types of regulations may be subject only to rational basis review, or whether some form of non-heightened scrutiny exists that is more exacting than rational basis review. As explained below, we find that the Rule does not trigger strict scrutiny and that it survives intermediate scrutiny.

In determining whether some form of heightened scrutiny applies, we consider two factors: "(1) 'how close the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.' Laws that neither implicate the core protections of the Second Amendment nor substantially burden their exercise do not receive heightened scrutiny." *N.Y. State Rifle*, 804 F.3d at 258, quoting *Ezell v. City of Chicago ("Ezell I")*, 651 F.3d 684, 703 (7th Cir. 2011). As relevant to the individual right to possess a firearm recognized in *Heller*, a statute can "implicate the core of the Second Amendment's protections by extending into the home, 'where the need for defense of self, family and property is most acute.'" *Id.,* quoting *Heller*, 554 U.S. at 628. Thus, in *Heller*, the Supreme Court struck down the District of Columbia's ban on handgun possession in the home because it completely prohibited "an entire class of 'arms' that is overwhelmingly chosen by American society for th[e] lawful purpose [of self-defense]." *Heller*, 554 U.S. at 628. The Court found that

14

this prohibition, which extended into the home, would fail constitutional muster under any standard of scrutiny. *Id.*

As to the second factor, we have held that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Decastro*, 682 F.3d at 166. "The scope of the legislative restriction and the availability of alternatives factor into our analysis of the degree to which the challenged law burdens the right." *N.Y. State Rifle*, 804 F.3d at 259 (internal quotation marks omitted). For example, since *Heller*, we have found New York's and Connecticut's prohibitions of semiautomatic assault weapons to be distinguishable from the ban struck down in *Heller*, because under those statutes, "citizens may continue to arm themselves with non-semiautomatic weapons *or* with any semiautomatic gun that does not contain any of the enumerated military-style features." *Id.* at 260 (emphasis in original). Even where heightened scrutiny is triggered by a substantial burden, however, strict scrutiny may not be required if that burden "does not constrain the Amendment's 'core'

area of protection." *Id.* Thus, the two factors interact to dictate the proper level of scrutiny.

The Plaintiffs argue that the Rule violates the Second Amendment in two ways: first, by preventing Plaintiff Colantone from taking the handgun licensed to his New York City residence and transporting it to his second home in Hancock, New York, and second, by preventing the Plaintiffs from taking their handguns licensed to New York City premises to firing ranges and shooting competitions outside the City. We address these arguments in turn.

In *Kachalsky*, we applied intermediate scrutiny and affirmed New York's "proper cause" requirement for the issuance of a carry license, despite finding that such a requirement "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public."[6] 701 F.3d at 93. In

---

[6] We are aware that a divided panel of the Seventh Circuit and a divided panel of the District of Columbia Circuit have disagreed with *Kachalsky*. *See Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012); *Wrenn v. District of Columbia*, 864 F.3d 650, 662 (D.C. Cir. 2017). After giving careful and respectful attention to the reasoning of those opinions, we reaffirm our prior holding, by which this panel is, in any event, bound. We also recognize that the Third and Fourth Circuits have adopted reasoning similar to ours in upholding various state regulations on the carrying of firearms outside the home. *See Drake v. Filko*, 724 F.3d 426, 433 (3d Cir. 2013); *Woollard v. Gallagher*, 712 F.3d 865, 880–81 (4th Cir. 2013). The Ninth Circuit upheld a similar regulation on other grounds. *Peruta v. Cty. of San Diego*, 824 F.3d 919, 924 (9th Cir. 2016) (en banc) (holding that "the Second Amendment

16

comparison to the regulation considered in *Kachalsky*, the restrictions complained of by the Plaintiffs here impose at most trivial limitations on the ability of law-abiding citizens to possess and use firearms for self-defense.[7] New York has licensed the ownership and possession of firearms in their residences, where "Second Amendment guarantees are at their zenith," *id*. at 89, and does nothing to limit their lawful use of those weapons "in defense of hearth and home"— the "core" protection of the Second Amendment, *Heller*, 554 U.S. at 634–35.

Strict scrutiny does not attach to Rule 5-23 as a result of Colantone's desire to transport the handgun licensed to his New York City residence to his second home in Hancock, New York. Even if the Rule relates to "core" rights under the

---

does not . . . protect a right of a member of the general public to carry concealed firearms in public"), cert. denied sub nom. *Peruta v. California*, 137 S. Ct. 1995 (2017).

[7] To the extent that the Plaintiffs are limited in their ability to carry firearms in public, those limitations are not imposed by Rule 5-23, but rather are inherent in their lack of carry permits. The Plaintiffs do not allege that they sought and were denied such permits, and the restrictions imposed on those who fail to demonstrate the requisite "proper cause" to obtain them were upheld in *Kachalsky*, 701 F.3d at 101. We understand the Plaintiffs to contend primarily that the restrictions on transportation of unloaded firearms in locked containers undermine their ability to make proper use of the premises permits they possess, and thereby impose substantial limits on their self-defense rights separate from those at issue in *Kachalsky*.

Second Amendment by prohibiting Colantone from taking his licensed firearm to his second home, the Rule does not substantially burden his ability to obtain a firearm for that home, because an "adequate alternative[] remain[s] for [Colantone] to acquire a firearm for self-defense." *Decastro*, 682 F.3d at 168; *see also New York State Rifle,* 804 F.3d at 259 ("No substantial burden exists . . . if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.") (internal quotation marks omitted). This case is easily distinguished from *Heller*, in which the Supreme Court considered, and deemed unconstitutional, an outright ban on the possession of handguns in the home. 554 U.S. at 635. Here, New York City imposes no limit on Colantone's ability to obtain a license to have a handgun at his second residence in Hancock; if he wants to keep a handgun at his Hancock house, he can apply to the licensing officers in Delaware County.[8] The Rule restricts only his ability to remove the handgun licensed by New York City authorities from the City premises for which it is specifically licensed.

---

[8] Colantone has not alleged or presented evidence that he has sought such a license.

Colantone presents no evidence that the costs, either financial or administrative, associated with obtaining a premises license for his house in Hancock, or acquiring a second gun to keep at that location, would be so high as to be exclusionary or prohibitive. In *Kwong v. Bloomberg*, we assumed that intermediate scrutiny applied to New York City's $340 application fee for a premises license and upheld that fee. 723 F.3d 160, 168 (2d Cir. 2013). We noted that otherwise-proper costs associated with a state's regulation of firearms could be impermissible "if [they] were so high as to be exclusionary or prohibitive." *Id.* at 166. But "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it substantially burdens that right." *Id*. at 167–68 (internal quotation marks omitted). Here, Colantone does not even estimate the amount of money or time potentially at issue by the requirement of obtaining a premises license and second firearm for his second home, and he does not allege that the Rule restricts in any way his ability to obtain such a firearm.

Next, the Plaintiffs argue that the Rule imposes a substantial burden on their core Second Amendment rights by prohibiting them from taking their licensed handguns to firing ranges and shooting competitions outside the City.

19

The Plaintiffs' primary argument is that the right to possess and use guns in self-defense suggests a corresponding right to engage in training and target shooting, and thus restrictions on the latter right must themselves be subject to heightened scrutiny. Their argument relies on the Seventh Circuit's observation that the core right of the Second Amendment to use firearms in self-defense, particularly in the home, "wouldn't mean much without the training and practice that make it effective." *Ezell I*, 651 F.3d at 704.

To the extent that the Plaintiffs argue that firearms practice is itself a core Second Amendment right, and that even minimal regulation of firearms training must survive heightened scrutiny to pass constitutional muster, we reject that argument. It is reasonable to argue, as did the plaintiffs in *Ezell I*, that restrictions that limit the ability of firearms owners to acquire and maintain proficiency in the use of their weapons can rise to a level that significantly burdens core Second Amendment protections. Possession of firearms without adequate training and skill does nothing to protect, and much to endanger, the gun owner, his or her family, and the general public.[9] Accordingly, we may assume that the ability to

---

[9] The *Heller* Court cited with approval a post-Civil War legal commentary by Judge and Professor Thomas Cooley: "[T]o bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . . ; it

20

obtain firearms training and engage in firearm practice is sufficiently close to core Second Amendment concerns that regulations that sharply restrict that ability to obtain such training could impose substantial burdens on core Second Amendment rights.[10] Some form of heightened scrutiny would be warranted in such cases, however, not because live-fire target shooting is *itself* a core Second Amendment right, but rather because, and only to the extent that, regulations amounting to a ban (either explicit or functional) on obtaining firearms training and practice substantially burden the core right to keep and use firearms in self-defense in the home. Indeed, if the Plaintiffs' broader argument were accepted, every regulation that applied to businesses that provide firearms training or firing-range use would itself require heightened scrutiny, a result far from anything the Supreme Court has required.

Our analysis puts the focus where it belongs: on the core right of self-defense in the home. Rule 5-23 imposes no direct restriction at all on the right of

---

implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order." *Heller*, 554 U.S. at 617–18 (internal quotation marks omitted).

[10] We make no such assumption, in contrast, regarding the ability to engage in competitive firearm sports. Purely recreational activities of that sort are unrelated to core Second Amendment concerns.

the Plaintiffs, or of any other eligible New Yorker, to obtain a handgun and maintain it at their residences for self-protection. All of the individual Plaintiffs hold licenses to maintain handguns for that purpose. The Plaintiffs do not allege that the City's regulatory scheme imposes any undue burden, expense, or difficulty that impedes their ability to possess a handgun for self-protection, or even their ability to engage in sufficient practice to acquire and maintain the skills necessary to keep firearms safely and use them effectively.

We are further unpersuaded by the Plaintiffs' attempts to analogize the Rule to the restrictions held unconstitutional in *Ezell I*, as those restrictions are easily distinguishable from the ones at issue in this case. *Ezell I* concerned a Chicago ordinance that flatly banned firing ranges within city limits (while simultaneously requiring, for the issuance of a handgun license, firearms training that was unavailable within the city). We can assume, without deciding, that the Seventh Circuit correctly concluded that such a dramatic ban on target shooting substantially limits the right of law-abiding citizens to engage in the training and practice that would enable them to safely and effectively make use of firearms for defensive purposes in the home. Under the Chicago ordinance, residents could not engage in firearms activities without leaving the city. At a minimum, such a

22

limitation imposes significant inconvenience, and we can accept, for purposes of

the argument in this case, that the imposition of such a burden comes close to

prohibiting gun training and practice altogether. Particularly when coupled with

a training requirement, such a limitation would impose a considerable obstacle to

gun ownership in the home. New York's rule, however, imposes no such

limitations. Rule 5-23 allows a holder of a premises license to take the handgun

licensed for his or her New York City premises to an authorized firing range in

the City to engage in practice, training exercises, and shooting competitions.

Nor does the City take away with one hand what it gives with the other, by

using its power to regulate firing ranges so restrictively that as a practical matter,

firing ranges are unavailable.  That was the route taken by Chicago in response to

the *Ezell I* ruling. In *Ezell v. City of Chicago ("Ezell II")*, the Seventh Circuit

confronted zoning restrictions that "severely limit[ed] where shooting ranges

may locate," and which were justified by nothing more than "sheer speculation

about accidents and theft." 846 F.3d 888, 894, 896 (7th Cir. 2017) (internal

quotation marks omitted). In finding that the restrictions acted as a functional

ban on firing ranges, the *Ezell II* Court cited calculations produced by the

plaintiffs showing that only about 2.2% of the city's acreage could even

theoretically be used to site a shooting range. *Id.* at 894. Additionally, the court referenced testimony from two experts, presented by the plaintiffs, indicating that other jurisdictions made available significantly more land for use by shooting ranges. *Id*.

In this case, by contrast, the Plaintiffs present no evidence demonstrating that the Rule serves to functionally bar their use of firing ranges or their attendance at shooting competitions. In fact, the Plaintiffs concede that seven authorized ranges are available to them, including at least one in each of the City's five boroughs. What the Plaintiffs seek is the inverse of what the *Ezell I* plaintiffs sought: they do not complain that they are required to undertake burdensome journeys away from the city in which they live in order to maintain their skills, but rather they demand the right to take their handguns to ranges and competitions *outside* their city of residence. While the Plaintiffs make passing reference to the possibility that some New York City residents might find a firing range located outside the City more convenient to use, or closer to their residence, than the nearest facility within their home borough or an adjoining borough, they offer no evidence that the burden imposed by having to use a

range within the City is in any way substantial.[11]

As with absolute limitations on the ability to engage in firearms training, laws that limit such opportunities by imposing excessive costs could in principle impose a substantial burden entailing heightened scrutiny. But the test, again, is whether core rights are substantially burdened. As we noted in *Kwong*, a "hypothetical licensing fee *could be* so high as to constitute a 'substantial burden,'" 723 F.3d at 168 n.15; nevertheless, we concluded that the permit fee charged by New York City did not impose such a substantial burden. *Id.* at 172.

Furthermore, a law that "regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Decastro*, 682 F.3d at 168; *see also Nordyke v. King*, 644 F.3d 776, 787 (9th Cir. 2011), aff'd. en banc, 681 F.3d 1041 (9th Cir. 2012) ("[W]hen deciding whether a restriction on gun sales substantially burdens Second Amendment rights, we should ask whether the restriction leaves law-abiding citizens with reasonable alternative means for obtaining firearms sufficient for self-defense purposes."). An analysis

---

[11] The Plaintiffs do not allege that the number or location of firing ranges in the City is a byproduct of the Rule or any burdensome zoning regulations, or that it is anything more than the result of market forces.

of the evidence in this case reveals that, contrary to the Plaintiffs' assertions, the Plaintiffs have sufficient opportunities to train with their firearms without violating the Rule.

The record evidence demonstrates that seven firing ranges in New York City are available to any premises license-holder. One range, Olinville Arms in the Bronx, is open to any member of the public for an hourly fee. Six of the firing ranges require payment of a membership fee, although at least one of those six is open to non-members for weekly shooting competitions. The Plaintiffs argue that they should not be relegated to joining "private clubs" in order to engage in firearms competitions, Appellants' Br. 51, but the record does not support any claim that these "clubs" are exclusionary in any way. Like privately owned gyms and other athletic facilities, they are places of public accommodation, open to anyone who pays their fees. The Plaintiffs do not argue that the fees charged by the available firing ranges are prohibitively expensive, still less that their cost is driven up by any burdensome or unreasonable City regulations. That some portion of the fee is charged in the form of an annual or monthly "membership," rather than a per-hour usage fee, does not put the facilities out of reach for license holders. Nor does it warrant a conclusion that New York City has imposed an

unreasonable burden on a resident's ability to pursue firearms training — which may be a somewhat costly pursuit in any event — thereby raising constitutional concerns.

Moreover, the Plaintiffs do not argue that the facilities located within the City are inadequate to provide the necessary opportunities for practice shooting. Indeed, the record reflects that some of these facilities are quite substantial. For example, the Richmond Boro Gun Club advertises a "100-yard rifle range with 30 covered and enclosed stations for Benchrest, Prone, and Bench shooting, [and an] outdoor 24 station 50-yard pistol range with covered and enclosed shooting bench with turning targets at 25 yards" among its many shooting facilities. App. 130. "Various rifle and pistol matches are held each week all year," according to their website, and these matches are open to non-members. *Id*.

Finally, nothing in the Rule precludes the Plaintiffs from utilizing gun ranges or attending competitions outside New York City, since guns can be rented or borrowed at most such venues for practice purposes. New York state law expressly allows individuals to use a gun that is not their own at a shooting range if the license holder is present. N.Y. Penal Law § 265.20(a)(7-a). We recognize that the Plaintiffs may prefer to practice with their own weapon —

27

something that the Rule makes fully possible within the City. That the Rule restricts practicing with their own firearms to ranges within the City does not make practicing outside the City or with their own firearms impossible, just not the two together.

In short, nothing in this record suggests that the limitations challenged by the Plaintiffs significantly inhibit their ability to utilize training facilities to obtain and maintain firearm skills, let alone that the Rule operates as a substantial burden on the right to keep and use firearms for self-defense in the home. Assuming *arguendo* that a total ban on firing ranges within the limits of a large city (as was at issue in *Ezell I*) or a functional ban on firing ranges through onerous zoning regulations (along the lines of *Ezell II*) would impose a substantial burden on the core Second Amendment right of residents to maintain firearms for self-defense in the home, we are not confronted with such a case here. Unlike the plaintiffs in *Ezell II*, the Plaintiffs here do not allege that any of the City's regulations, including Rule 5-23, serve to deter the construction or existence of firing ranges within city limits. Furthermore, given the existence of ample facilities for live-fire training and practice available at market prices within reasonable commuting distance from the homes of all City residents, the

28

restrictions imposed by the Rule do not impose a substantial burden on the core Second Amendment right to own and possess handguns for self-defense.

It is clear, based on the essentially undisputed facts recited above, that strict scrutiny is not triggered by the Rule, either as applied to Colantone's second home or to the Plaintiffs' desire to take their handguns outside the City for shooting competitions or target practice. However, some form of heightened scrutiny may still be required. We have applied intermediate scrutiny when analyzing regulations that substantially burdened Second Amendment rights or that encroached on the core of Second Amendment rights by extending into the home. *See, e.g.*, *N.Y. State Rifle*, 804 F.3d at 258–59 (applying intermediate scrutiny to statutes that were "both broad and burdensome" and that "implicate the core of the Second Amendment's protections"); *Kachalsky*, 701 F.3d at 93 (applying intermediate scrutiny to requirement that "places substantial limits on the ability of law-abiding citizens to possess firearms for self-defense in public").

Because we assume, *arguendo*, that the Rule approaches the Second Amendment's core area of protection as applied to Colantone's second home, though it does not impose a substantial burden, we find that intermediate scrutiny is appropriate to assess the Rule in that instance. As to the Plaintiffs'

29

access to firing ranges and shooting competitions, the Rule does not approach the

core area of protection, and we find it difficult to say that the Rule substantially

burdens any protected rights. "But we need not definitively decide that applying

heightened scrutiny is unwarranted here," *Kwong*, 723 F.3d at 168, because we

find that the Rule would survive even under intermediate scrutiny. Accordingly,

we proceed to assess the Rule by applying intermediate scrutiny.

B.  *Application of Intermediate Scrutiny*

When applying intermediate scrutiny under the Second Amendment, "the

key question is whether the statute[] at issue [is] substantially related to the

achievement of an important governmental interest." *N.Y. State Rifle*, 804 F.3d at

261 (internal quotation marks omitted).

> To survive intermediate scrutiny, the fit between the challenged regulation [and the government interest] need only be substantial, not perfect. Unlike strict scrutiny analysis, we need not ensure that the statute is narrowly tailored or the least restrictive available means to serve the stated governmental interest. Moreover, we have observed that state regulation of the right to bear arms has always been more robust than analogous regulation of other constitutional rights. So long as the defendants produce evidence that fairly supports their rationale, the laws will pass constitutional muster.

*Id.* (internal quotation marks and footnotes omitted, brackets in original).[12]

The Rule seeks to protect public safety and prevent crime, and "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." *Kachalsky*, 701 F.3d at 97. "[W]hile the Second Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns with regard to handgun ownership and use in public." *Id.* at 96. "There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety." *Id.* at 94–95; *see also U.S. v. Masciandaro*, 638 F.3d 458, 470

---

[12] This language from *New York State Rifle* suggests that, under intermediate scrutiny, as we discuss in Section I.B, the City bears the burden of showing that the Rule passes muster. Allocating the burden of proof in this way is consistent with the Supreme Court's approach in other areas of constitutional law that involve heightened, but not strict, scrutiny. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72 (2011) ("Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment."); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The burden of justification" in a sex-based Equal Protection challenge "rests entirely on the State."). In Section I.A.2, by contrast, we determined what level of scrutiny to apply by assessing the Plaintiffs' proffered evidence in support of their position that the Rule substantially encumbers their core rights. That initial emphasis on the Plaintiffs' showing aligns with the approach that we have adopted in other constitutional cases. *See N.Y. State Rifle*, 804 F.3d at 259 ("We typically require a threshold showing to trigger heightened scrutiny of laws alleged to implicate such constitutional contexts as takings, voting rights, and free speech.").

(4th Cir. 2011) ("[O]utside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense.").

The City has presented evidence supporting its contention that the Rule serves to protect the public safety of both license-holding and non-license-holding citizens of New York City. In a detailed affidavit, the former Commander of the License Division, Andrew Lunetta, discussed why taking a licensed handgun to a second home or a shooting competition outside the City, even under the restrictions imposed by the Rule for permitted transportation, constitutes a potential threat to public safety. He explained that premises license holders "are just as susceptible as anyone else to stressful situations," including driving situations that can lead to road rage, "crowd situations, demonstrations, family disputes," and other situations "where it would be better to not have the presence of a firearm." App. 68. Accordingly, he stated, the City has a legitimate need to control the presence of firearms in public, especially those held by individuals who have only a premises license, and not a carry license. He went on to discuss how "public safety will be compromised" unless the regulations concerning when and where premises licensees can transport their firearms "can

32

be effectively monitored and enforced, and are not easily ignored or susceptible to being violated." *Id.* at 69.

Indeed, the City produces evidence that it has, in the past, had difficulty monitoring and enforcing the limits of the premises license. Lunetta's affidavit documented "abuses" that occurred when, prior to adoption of the current Rule, the City *did* allow licensees to carry their handguns to shooting ranges out of the City. "Examples included, licensees travel[]ing with loaded firearms, licensees found with firearms nowhere near the vicinity of an authorized range, licensees taking their firearms on airplanes, and licensees travel[]ing with their firearms during hours where no authorized range was open." *Id.* at 77. Based on these abuses, Lunetta explained, the New York Police Department was concerned that allowing premises licensees to transport their firearms anywhere outside of the City for target practice or shooting competitions made it "too easy for them to possess a licensed firearm while traveling in public, and then if discovered create an explanation about traveling for target practice or shooting competition." *Id.* at 70.

According to Lunetta's affidavit, the New York Police Department concluded that officers cannot be expected to verify whether a licensee stopped

with a firearm was, in fact, traveling to a firing range outside of the City. Based on that specific experience, the License Division restricted the scope of the premises license to allow for the transportation of the licensed handgun only to a firing range within New York City (or, with the proper additional authorization, to a designated hunting area). Lunetta explained the reasoning for the License Division's decision: "When target practice and shooting competitions are limited to locations in New York City the ability to create . . . a fiction[al legal purpose] is limited." *Id.* Thus, the City asserts, limiting the geographic range in which firearms can be carried allows the City to promote public safety by better regulating and minimizing the instances of unlicensed transport of firearms on city streets.

In contrast to the City's evidence supporting the Rule's rationale, the Plaintiffs have produced scant evidence demonstrating any burden placed on their protected rights, and nothing which describes a substantial burden on those rights. The Plaintiffs have submitted individual affidavits expressing their desire to travel to additional locations with their handguns, and their decision not to participate in certain shooting competitions outside of the City. But, as we have stated, the Plaintiffs are still free to participate in those shooting competitions

34

with a rented firearm, and to obtain licenses for handguns in their second homes, and the Plaintiffs have presented no evidence indicating that this understanding is mistaken. Additionally, the Plaintiffs present no evidence that the firing ranges that they wish to access outside the City are significantly less expensive or more accessible than those in the City. Even if the Plaintiffs did provide this evidence, they would still need to demonstrate that practicing with one's own handgun provides better training than practicing with a rented gun of like model, and the Plaintiffs fail to even assert this fact.

In light of the City's evidence that the Rule was specifically created to protect public safety and to limit the presence of firearms, licensed only to specific premises, on City streets, and the dearth of evidence presented by the Plaintiffs in support of their arguments that the Rule imposes substantial burdens on their protected rights, we find that the City has met its burden of showing a substantial fit between the Rule and the City's interest in promoting public safety.

Constitutional review of state and local gun control will often involve difficult balancing of the individual's constitutional right to keep and bear arms against the states' obligation to "prevent armed mayhem in public places."

*Kachalsky*, 701 F.3d at 96, quoting *Masciandaro*, 638 F.3d at 471. This is not such a case. The City has a clear interest in protecting public safety through regulating the possession of firearms in public, and has adduced "evidence that fairly supports [the] rationale" behind the Rule. *N.Y. State Rifle*, 804 F.3d at 261 (brackets and internal quotation marks omitted). The burdens imposed by the Rule do not substantially affect the exercise of core Second Amendment rights, and the Rule makes a contribution to an important state interest in public safety substantial enough to easily justify the insignificant and indirect costs it imposes on Second Amendment interests. Accordingly, Rule 5-23 survives intermediate scrutiny.

## II. Rule 5-23 Does Not Violate the Commerce Clause.

The Plaintiffs next argue that Rule 5-23 violates the dormant Commerce Clause because it hinders interstate commerce. However, the Supreme Court has "recogniz[ed] that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people." *City of Phila. v. New Jersey*, 437 U.S. 617, 623–24 (1978). Our inquiry "must be directed to determining whether [the challenged statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to

legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.* at 624. We laid out the framework for this inquiry in *Town of Southold v. Town of East Hampton*:

> In analyzing a challenged local law under the dormant Commerce Clause, we first determine whether it clearly discriminates against interstate commerce in favor of intrastate commerce, or whether it regulates evenhandedly with only incidental effects on interstate commerce. . . . We then apply the appropriate level of scrutiny. A law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and will survive only if it is demonstrably justified by a valid factor unrelated to economic protectionism. A law that only incidentally burdens interstate commerce is subject to the more permissive balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains.

477 F.3d 38, 47 (2d Cir. 2007) (internal quotation marks and citations omitted).

The Plaintiffs argue that the Rule discriminates against interstate commerce by prohibiting them "from engaging in the interstate commercial activity of traveling with their handguns to patronize firing ranges in states beyond the borders of New York City." Appellants' Br. 42. "A clearly discriminatory law may operate in three ways: (1) by discriminating against

37

interstate commerce on its face; (2) by harboring a discriminatory purpose; or (3) by discriminating in its effect." *Town of Southold*, 477 F.3d at 48 (citations omitted). In our view, the Rule does not offend in any of these ways.

The Rule does not facially discriminate against interstate commerce, as it does not prohibit a premises licensee from patronizing an out-of-state firing range or going to out-of-state shooting competitions. The Plaintiffs are free to patronize firing ranges outside of New York City, and outside of New York State; they simply cannot do so with their premises-licensed firearm.

The Plaintiffs also present no evidence that the purpose of the New York City rule was to serve as a protectionist measure in favor of the City's firing-range industry. To the contrary, as discussed above, the Rule is designed to protect the health and safety of the City's residents. It is therefore directed to legitimate local concerns, with only incidental effects upon interstate commerce.

Finally, the Plaintiffs have not convinced us that the Rule violates the dormant Commerce Clause by creating a discriminatory effect on interstate commerce. We note, first, that the Plaintiffs have offered no evidence of discriminatory effect aside from their statements that they, personally, have "refrained from attending any shooting events with [their] handgun[s] that take

place outside of the City of New York." App. 33, 42, 46. They do not assert, for example, that they have refrained from attending *all* shooting events outside the City; they aver only that (in compliance with the Rule) they have refrained from attending such events with their premises-licensed handguns.

Even if we were to assume for the sake of argument, however, that the Plaintiffs have offered sufficient evidence of a discriminatory effect to raise a substantial dormant Commerce Clause question, we would nonetheless conclude that the Rule is "demonstrably justified by a valid factor unrelated to economic protectionism." *Town of Southold*, 477 F.3d at 47. The Plaintiffs themselves offer a useful comparison, arguing that the Rule functions in the same way as a law requiring New York City residents to use their tennis rackets only at in-City tennis courts. Of course, tennis rackets present none of the public safety risks that firearms do, and against which states have a legitimate interest in protecting themselves. *See, e.g.*, *Kachalsky*, 701 F.3d at 94–95 ("There is a longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety."). Thus, there could be no public health justification for a law limiting the transportation of tennis rackets, whereas here the Rule clearly focuses on minimizing the risks of gun violence and

"prevent[ing] armed mayhem in public places." *Masciandaro*, 638 F.3d at 471

(internal quotation marks omitted); *see also W. Lynn Creamery, Inc. v . Healy*, 512

U.S. 186, 206 n.21 (1994) (noting the "deeply rooted" distinction "between the

power of the State to shelter its people from menaces to their health or safety . . . ,

even when those dangers emanate from interstate commerce, and its lack of

power to . . . constrict the flow of such commerce for their economic advantage");

*Maine v. Taylor*, 477 U.S. 131, 151 (1986). While such a justification might

theoretically be shown to be pretextual, the Plaintiffs have provided no evidence

that the true intent or function of the Rule was protectionist. Accordingly, we

conclude that the Rule does not discriminate against interstate commerce.[13]

Additionally, the Plaintiffs contend that Rule 5-23 has an impermissible

extraterritorial effect because it attempts to control economic activity that is fully

outside of New York City. But Rule 5-23 does not govern extraterritorial conduct

in any way. As noted above, the Plaintiffs are free to patronize out-of-state firing

---

[13] The Plaintiffs have not argued that the Rule incidentally burdens interstate commerce, which would subject the Rule to a more lenient balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Accordingly, we do not address that issue. *Cf. Town of Southold,* 477 F.3d at 49 n.2 (finding that "[d]espite counsel's failure to elaborate upon the *Pike* test, the limited reference to *Pike* in the brief is sufficient to allow us to give full consideration to it here.").

ranges and to use firearms for target practice or competitive sporting events anywhere in the country or beyond; they simply may not transport the firearm licensed to them for possession at a particular New York premises to such locations. To the extent that the Rule has any effect on conduct occurring outside the City, "[t]he mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Osborn v. Ozlin*, 310 U.S. 53, 62 (1940). An ordinance may be unconstitutional when it regulates commerce that takes place fully outside its borders. *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989). But "the Commerce Clause's ban on extraterritorial regulation must be applied carefully so as not to invalidate many state laws that have permissible extraterritorial effects." *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 68 n.19 (2d Cir. 2010). Here, the Rule directly governs only activity within New York City, in order to protect the safety of the City's residents. Any extraterritorial impact is incidental to this purpose and thus "is of no judicial significance." *Osborn*, 310 U.S. at 62.

## III.    Rule 5-23 Does Not Violate the Right to Travel.

The Plaintiffs next invoke the constitutional right to travel interstate. "The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." *United States v. Guest*, 383 U.S. 745, 757 (1966). This Court has "acknowledge[d] a correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971). However, that local regulations "[m]erely hav[e] an effect on travel is not sufficient to raise an issue of constitutional dimension." *Soto-Lopez v. N.Y.C. Civil Serv. Comm'n*, 755 F.2d 266, 278 (2d Cir. 1985). The constitutional right is implicated only when the statute "actually deters such travel, or when impedance of travel is its primary objective, or when it uses any classification which serves to *penalize* the exercise of that right." *Id.* at 279 (internal quotation marks and citations omitted) (emphasis in original).

The Plaintiffs' right to travel argument fails for much the same reasons as does their parallel invocation of the dormant Commerce Clause. Nothing in the Rule prevents the Plaintiffs from engaging in intrastate or interstate travel as they

wish. The Plaintiffs may go where they like, and in particular may attend and participate in shooting tournaments or similar events held outside the City of New York. The regulation concerns only their ability to remove the specific handgun licensed to their residences from the premises for which they hold the license. The Constitution protects the right to travel, not the right to travel armed.

The Rule was not designed to impede interstate travel and the history behind it "demonstrates that its purpose was not to impede travel but to protect the welfare of [city] residents." *Town of Southold*, 477 F.3d at 54. Nor does the Rule impose a significant disincentive to travel, any more than any other regulation that limits the possession in one jurisdiction of items that may be more broadly permitted in another. Any incidental impact on travel does not create a constitutional violation because "[i]f every infringement on interstate travel violates the traveler's fundamental constitutional rights, any governmental act that limits the ability to travel interstate, such as placing a traffic light before an interstate bridge, would raise a constitutional issue." *Id.* State and local regulations that have an indirect effect on some travel impose merely "minor restrictions on travel [that] simply do not amount to the denial of a fundamental right." *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 258 (2d Cir. 2013).

## IV.     Rule 5-23 Does Not Violate the First Amendment.

The Plaintiffs argue that the Rule violates their First Amendment right to expressive association by (1) curtailing their ability to join the gun club of their choice and (2) forcing them to join a gun club in New York City. We disagree.

The Plaintiffs fail to demonstrate how the ability to join a specific gun club, or the ability to transport their licensed firearms to a shooting club outside of New York City, qualifies as expressive association. "The Constitution does not recognize a generalized right of social association. The right generally will not apply, for example, to business relationships; chance encounters in dance halls; or paid rendezvous with escorts." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997) (citations omitted). "It is possible to find some kernel of expression in almost every activity a person undertakes – for example, walking down the street or meeting one's friends at a shopping mall – but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). "Typically a person possessing a gun has no intent to convey a particular message, nor is any particular message likely to be understood by those who view it." *Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003). The Plaintiffs fail to identify what

44

expressive activity they would engage in with their guns and argue instead that they seek "participation in recreational and competitive shooting events." Appellants' Br. 51. Gathering with others for a purely social and recreational activity, whether it is dancing, *Sanitation & Recycling Indus.*, 107 F.3d at 996, or shooting guns, does not constitute expressive association under the First Amendment. Accordingly, the ability to join a specific gun club is not protected association under the First Amendment.

Even if we were to assume that engaging in firearms training or competition qualifies as expressive association, as repeatedly discussed above, the Plaintiffs are not prevented from engaging in such activities, wherever or with whomever they choose to do so.

First, nothing in the Rule forbids the Plaintiffs from joining and associating with gun clubs outside the City. The Plaintiffs claim that the Rule "impedes their right to associate with whom they choose,"Appellants' Br. 50, but the Rule does nothing of the sort. The Plaintiffs remain free to associate with whomever they choose. They may join any club they like outside of New York City. To the extent that the gun clubs the Plaintiffs wish to join "take positions on public questions or perform any of the other similar activities" characteristic of expressive

45

association, *City of Dallas*, 490 U.S. at 25 (internal quotation marks omitted), the Plaintiffs are not inhibited from joining in those activities. The Rule limits only their ability to carry the handgun that is licensed for a specific premises outside of those premises.

The Plaintiffs also contend that the Rule constitutes "forced association" because it "effectively coerce[s]" them to join clubs that they "may prefer not to join." Appellants' Br. 51. That "effective" coercion is not coercion at all: the Rule does not require the Plaintiffs to join a gun club in New York City. The licensing scheme does not require the Plaintiffs to complete firearms training, and even if it did, they have access to Olinville Arms, which is open to the public, and the Richmond Boro Gun Club, which is available to non-members for weekly shooting competitions.

Regardless, the Plaintiffs are incorrect that there is any constitutional injury at stake in the question of "membership" in a firing range or gun club. As noted above, the Plaintiffs have not demonstrated that their firearms training is expressive association, and actually concede that it is recreational activity. Moreover, the decision of whether to charge a membership fee or a fee based on hourly usage is a business decision of the club or range. The Plaintiffs have

offered no evidence that the firing ranges in New York City that structure themselves as clubs requiring "membership" either engage in (or require their members to engage in) expressive activity of any kind, let alone activity to which the Plaintiffs object. Nor have the Plaintiffs shown that these ranges have selected their particular fee structures as a byproduct of the Rule, or that their fee structures reflect any ideological or expressive content to which the Plaintiffs, by utilizing the range, can be taken as assenting.

Accordingly, the Rule does not violate the First Amendment.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.